W. Smith JARROTT, Charles D. Lenhoff, et ux., Plaintiffs,

v.

Samuel SCRIVENER, Jr., William F. McIntosh, Arthur P. Davis, Charles C. Koones, Robert O. Clouser, Members of the Board of Zoning Adjustment

and

J. J. Ilgenfritz, Director of Licenses and Inspections, Defendants.

Civ. A. No. 1760–63.

United States District Court
District of Columbia,
Civil Division.

Jan. 28, 1964.

John H. Pratt, Washington, D. C., for plaintiffs.

George H. Clark, Asst. Corp. Counsel, Chester H. Gray, Corp. Counsel, John A. Earnest, and James M. Cashman, Asst. Corp. Counsel, Washington, D. C., for defendants.

PINE, District Judge.

In this action plaintiffs pray for judgment declaring null and void an order of the District of Columbia Board of Zoning Adjustment, hereinafter referred to as the Board. They also seek an injunction directing the Board to set aside this order, and prohibiting the Director of Licenses and Inspections from issuing a building or occupancy permit relating to the property subject of this order.

This property hereinafter referred to as "Bonnie Brae," the present name of the estate, consists of approximately 16 acres of land improved by a large dwelling and situate in the outskirts of the District of Columbia near its Maryland border. The plaintiffs are owners of lands and premises immediately adjacent to "Bonnie Brae." Defendants are members of the Board and the Director of Licenses and Inspections, respectively.

The plaintiffs' property and Bonnie Brae are located in what is known as an R-1 Zoning District. This is the most restrictive zoning classification in the District of Columbia, and will hereinafter be discussed in some detail.

The owner of Bonnie Brae contracted to sell it to one Martin M. Decker, who on March 28, 1963, filed "an appeal * * * for exception" to the zoning regulations to permit the erection of a building to be used as an embassy and chancery by the government of the USSR, to which the property would be conveyed.

Under the revised plans submitted by appellant, the existing dwelling would be demolished, and a building would be erected which would contain approximately 71,000 sq. ft. of floor space above grade, and, with garage and other usable underground space, would have a total of approximately 91,000 sq. ft. It would contain approximately 140 rooms devoted to chancery purposes and approximately 17 rooms as a residence for the Ambassador, his immediate family and servants. Off street outdoor parking area for approximately 145 cars would be provided. The structure would accommodate approximately 125 persons, including servants, the immediate family of the Ambassador, and chancery personnel.

A public hearing on this appeal was set for April 18, 1963, at which time the appellant before the Board and those opposed to the granting of the appeal were heard. The appeal was then taken under consideration by the Board, and

apparently revised plans were requested by the Board and submitted by appellants. Thereafter a second public hearing was scheduled and held on June 12, 1963. Petitions and letters were filed and property owners were heard in opposition.

On June 18, 1963, the Zoning Commission made its findings of fact and rendered its opinion in which it held, by vote of three to two, that the appeal was granted on the basis of plans submitted at the second hearing, but subject to approval by the Board of detailed plans, architectural and screening, prior to issuance of the permit, and also subject to the condition that a fence, if provided, should be placed at a certain location, and that tree removal should be minimal and replacements made where practicable.

Thereafter this action was instituted.

Plaintiffs claim that they were denied a fair and impartial hearing "for the reason that, during the course of proceedings, and prior thereto, all members of the Board were subjected to improper pressure by means of letters from Dean Rusk, Secretary of State, and Charles Horsky, Advisor for National Capital Affairs, the White House, and by oral communications, by telephone or otherwise, made by Horsky and Pedro Sanjuan of the State Department and General Clarke, Engineer Commissioner of the District of Columbia to the Board members Scrivener, Clouser and McIntosh, all of which persons, except for the Board members, being persons highly placed in the governments of the District of Columbia and the Executive Branch of the U. S." On the basis of this assertion plaintiffs claim that the order of the Board is a nullity.

There is no statutory appeal from the orders of the Board and this action comes before this court for relief, injunctive and otherwise, under its general equity powers. Ordinarily, a review by the court of the decision of the Board would be limited to the Board's record of proceedings before it, and the court would not be permitted to hear evidence *dehors* that record. But in this case, where the integrity of the Board's decision is questioned, the court may go outside the Board's record and receive independent evidence, as was done in this case. That the court may do so is conceded by defendants.

The foregoing gives the posture of the case procedurally.

Before reviewing the evidence and in order to provide a clearer understanding of the contentions of plaintiffs, the relevant statutes and the participants should be put in perspective.

The Constitution of the United States in Art. I, § 8, provides that the Congress shall have power to exercise exclusive legislation over the District of Columbia and to make all laws necessary and proper for carrying this and other powers into execution. Pursuant thereto, Congress authorized the President, by and with the advice and consent of the Senate, to appoint two persons, who, with an officer of the Corps of Engineers of the United States Army, shall be Commissioners of the District of Columbia.[1] Congress further provided that the Engineer Commissioner may in the discretion of the President be detailed from among the officers of this Corps.[2] It vested executive power in these Commissioners,[3] and authorized them to remove from office and make appointments to any office under them.[4]

In 1920 Congress created a Zoning Commission for the District of Columbia consisting of the Commissioners of the District of Columbia, Director of the National Park Service and the Architect of the Capitol.[5] Generally stated, it is empowered by statute to regulate the location, height, bulk, number of stories and size of buildings, the percentage of

---

1. § 1–201, D.C.Code (1961 ed.)

2. § 1–202, D.C.Code (1961 ed.)

3. § 1–218, D.C.Code (1961 ed.)

4. § 1–216, D.C.Code (1961 ed.)

5. § 5–412, D.C.Code (1961 ed.)

lot which may be occupied, the density of population and the uses of the buildings and land for trade, industry, residence, recreation, public activities and other purposes. Pursuant thereto, the Commission is authorized to divide the District into zones of such number, shape, and area, as the Commission may determine, and within such districts it may regulate the erection, construction, reconstruction, alteration, conversion, maintenance, and uses of buildings and structures and the uses of land.[6] Congress also provided that the regulations made pursuant thereto shall be in accordance with a comprehensive plan and designed to lessen street congestion, to secure safety from fire, panic and other dangers, to promote health and the general welfare, to provide adequate light and air, to prevent the undue concentration of population and the overcrowding of land, and to promote such distribution of population and of uses of land as would tend to create conditions favorable to health, safety, transportation, prosperity, protection of property, civic activity and recreational, educational and cultural opportunities.[7]

Under this authority, the Zoning Commission has promulgated regulations for certain zones or districts, into which it has divided the District. Among them is one classified as "R-1." This district, under the regulations, "is designed to protect quiet residential areas now developed with *one family detached dwellings* and adjoining vacant areas likely to be developed for such purposes," and to "stabilize such areas and to promote a suitable environment for family life."[8] (Italics in regulation) This is the most restrictive of all the zoning classifications. Plaintiffs' property and Bonnie Brae, as well as the large number of persons objecting to the appeal own property in this zoning classification, and are in the same area.

Congress in 1938 created the Board of Zoning Adjustment. It is an adjunct of,

and in a sense complementary to, the Zoning Commission. It is composed of five members, who are defendants herein, appointed by the Commissioners of the District of Columbia, namely, one member of the National Capital Planning Commission, or a member of the staff thereof to be designated by such Commission, one member of the Zoning Commission, or member of the staff thereof to be designated by such Commission, and three other members each of whom shall have been a resident of the District of Columbia for at least three years immediately preceding his appointment and at least one of whom should own his own home.

This Board is given power, by the statute creating it, to hear and decide, in accordance with the provisions of the regulations of the Zoning Commission, supra, requests for special exceptions upon which the Board is required or authorized by the regulations to pass.[9] The appeal to the Board apparently was taken under the aforementioned provision of the statute.

Under this provision the Zoning Commission has promulgated certain regulations, among which is § 8207.2. This authorizes the Board

"to grant special exceptions as provided in the preceding Articles of these regulations where in the judgment of the Board such special exceptions will be in harmony with the general purpose and intent of the zoning regulations and maps and will not tend to affect adversely the use of neighboring property in accordance with said zoning regulations and maps, subject in each case to the special conditions specified in said Articles, as follows:"

Then follows a list of types of special exceptions, included in which is the type, "Chancery," opposite which appear the words "any R District" and a reference to the section in which the conditions

---

6. § 5-412, 5-413, D.C.Code (1961 ed.)

7. § 5-414, D.C.Code (1961 ed.)

8. § 3101.1 Zoning Regulations 1958, as revised 1960

9. § 5-420, D.C.Code (1961 ed.)

referred to are specified, namely, § 3101.410.

Section 3101.410 provides as follows: "Chancery, provided all other appropriate provisions of these regulations are complied with and provided further that the proposed use of the building in which the use is to be conducted are compatible with present and proposed development of the neighborhood. In determining compatibility the Board shall find that:

"(a) The size and scope of the operation will not be objectionable because of noise, traffic, or the number of employees employed;

"(b) The amount and arrangement of parking spaces and loading berths are adequate, and

"(c) The architectural design and arrangement of all structures are in keeping with the character of the neighborhood."

Under these regulations, it will be seen that the question presented to the Board is one in respect of which opinions might differ, and one requiring close scrutiny and analysis. Whether the structure hereinabove described comes within these regulations was hardly a *pro forma*, or open-and-shut, question before the Board.

■ Generally stated, the correctness or incorrectness of the decision of the Board is not one for judicial review if there is substantial evidence to support it and the parties have been accorded due process of law; and the foregoing reference to statutes and regulations is only for the purpose of showing that the question raised by the plaintiffs is one of substance and not of form. This is also disclosed by the one-vote margin on the Board in support of the appeal.

I shall now turn to an identification of the participants in this challenged decision and an identification of certain of the witnesses.

Defendant Clouser, a member of the Board, is Planning Officer for the Zoning Commission, which appointed him to his position as Planning Officer and which designated him for membership on the Board. Three of the five members of the Zoning Commission are the Commissioners of the District of Columbia who appointed him to membership on the Board. Defendant McIntosh, a member of the Board, is the designee of the National Capital Planning Commission, and was appointed by the three Commissioners of the District to membership on the Board. The three other members of the Board are non-government officers, among them is Mr. Samuel Scrivener, Jr., who is Chairman of the Board. The other two were the dissenting members.

Mr. Charles E. Horsky was and is Advisor to the President for National Capital Affairs, and Mr. Pedro Sanjuan was Director of Special Protocol Services of the State Department. General Clarke was the Engineer Commissioner as well as a member of the Zoning Commission of the District. The interlocking relationship between the Commissioners of the District, the Zoning Commission of the District and the Zoning Board is apparent from the foregoing.

Turning to the evidence, the following facts were disclosed at the hearing before me: Defendant Clouser was verbally contacted by General Clarke, the Engineer Commissioner, who was one of his superiors. This contact was before the filing of the appeal before the Board. The Engineer Commissioner at that time told Mr. Clouser that he had been asked by the White House to advise the Board to consider the "national interest involved" when the application herein was filed. Mr. Clouser suggested to General Clarke that he should obtain something in writing from the White House or from the State Department to that effect, and that it should come from someone in a higher position than Mr. Sanjuan. Defendant Clouser also received telephone calls and a personal visit from Mr. Sanjuan while the matter was under consideration by the Board. On one of these occasions Mr. Sanjuan asked defendant Clouser what the chances were of suc-

cess, and Mr. Clouser replied that they were "50–50."

Defendant Scrivener, Chairman of the Board, received two telephone calls from the Engineer Commissioner, one of them being between the two hearing dates. He also talked with the President of the Board of Commissioners and the Engineer Commissioner about the "Russian case." In one of the telephone conversations first referred to, the Engineer Commissioner said that he did "not want to bother" defendant Scrivener and knew that he "would vote any way [he] want[ed]," but asked him to keep the "position of the Federal Government in mind." The conversation between defendant Scrivener and the two Commissioners was "exactly the same" as the telephone conversation with the Engineer Commissioner. At an unidentified date, defendant Scrivener met the President of the Board of Commissioners and was asked when the case would be decided. Upon being told by defendant Scrivener that he didn't know the President of the Board of Commissioners said that he hoped "you boys do the right thing." Defendant Scrivener also received one telephone call from Mr. Horsky, shortly before the second hearing, and the substance of that conversation was the same as that with the Engineer Commissioner. Defendant Scrivener received one telephone call and one visit from Mr. Sanjuan. The telephone call was between the two hearing dates and the visit was during the same period of time. Mr. Sanjuan explained that the "American Government was very anxious to move the Moscow embassy to a special location, and that those negotiations would be expedited if the Russians were able to move out on Oregon Avenue," the location of Bonnie Brae.

The Engineer Commissioner spoke to defendant McIntosh and told him that the Federal Government was interested in the outcome of the application.

No record was made in the Board official file of these telephone conversations and personal conferences. No reason has been given for failing to make a record of them. No reference to them was made at the public hearings before the Board. The interested parties objecting were in the dark so far as their existence is concerned.

The two non-government members of the Board, who dissented, were not contacted by anyone.

In addition, a letter was written by the Secretary of State to the Special Advisor to the President, and by the latter transmitted by letter to the Engineer Commissioner, who tranmitted both letters to defendant Clouser. The latter brought this letter to the attention of the other four members of the Board. This letter from the Secretary stated that the "Department of State strongly supports the Soviet application" for "permission to relocate their chancery in an R-1 zone" and that the "President has informed [the Secretary] that he too recognizes the desirability of permitting the Soviets to relocate their chancery." This letter also stated that "any effort on [the Special Advisor's] part to expedite the Soviet application will be greatly appreciated." This letter from the Secretary of State was not made known to the objecting parties and was "deliberately" omitted from the official file. This was done at the instance of the Engineer Commissioner, and acquiesced in by Mr. Horsky, and the reason given by the former is that it might be embarrassing to the Executive Branch to have the letter in the public file if the appeal was denied. Until this testimony was received, I was unaware of any such sensitivity on the part of the Executive Branch of the Government.

The only record before the Board of the State Department's position was a letter from Mr. Sanjuan to Mr. Clouser transmitted at about the time the appeal was filed, in which the former stated that he had examined the embassy's request and found no objection, and that he supported it. This letter was the "usual" letter written in every chancery appeal and the type that Mr. Clouser felt would be inadequate. This was placed in the official file.

What was said during these verbal contacts above set forth can only be obtained from the lips of the interested parties themselves. Their testimony is to the effect that the person making the contact expected the Board member would be dutiful in making his decision, but asked that he remember the national interest. The similarity of language employed by these witnesses as to what was said might excite a degree of skepticism as to their unqualified dependability, especially when it comes from witnesses who have a deep interest in the outcome of this case; but taking the testimony at its face value, and without implying that any of the witnesses colored or perverted the truth, which I do not do, the fact remains that members of the Board, two of whom were government employees occupying relatively subordinate positions, were secretly informed that highly placed persons in the Executive and District Branch of Government had a strong interest in a favorable decision by the Board.

Moreover, except for the information imparted to Mr. Scrivener by Mr. Sanjuan at their conference following the first hearing, there was never any explanation given to the Board members themselves as to what was embraced by this term "national interest," which they were asked to remember. The objectors were never advised, officially in the proceedings, of the Sanjuan statement to Mr. Scrivener or that it represented the position of the State Department; and they had no basis, other than speculation in the press, to question, if it did represent the State department's position, whether it was one legally and properly to be taken into consideration by the Board in making its decision under the regulations. Indeed, the only evidence in the official record that there was a national interest, although not stating what it was, is the "usual" letter from Mr. Sanjuan hereinbefore referred to.

The question for decision, therefore, is whether plaintiffs, under the above stated circumstances, were denied a fair and impartial hearing before the Board. If they were, they are entitled to relief by this court.

The Board, like so many other quasi-judicial tribunals which have been created in recent years, performs judicial functions within its narrow and specialized jurisdiction. No authority would appear to be necessary to support the conclusion that in the performance of this adjudicatory function, the parties whose rights are involved are entitled to the same fairness, impartiality and independence of judgment as are expected in a court of law. Although procedures and rules of evidence are less rigid in quasi-judicial bodies than in courts, there can be no difference, under our concept of justice, between the two tribunals in respect of these fundamental requirements. As stated in National Labor Relations Board v. Phelps, 136 F.2d 562 (5th Cir. 1943):

> * * * "[F]or a fair trial by an unbiased and non-partisan trier of the facts is of the essence of the adjudicatory process as well when the judging is done in an administrative proceeding by an administrative functionary as when it is done in a court by a judge. Indeed, if there is any difference, the rigidity of the requirement that the trier be impartial and unconcerned in the result applies more strictly to an administrative adjudication where many of the safeguards which have been thrown around court proceedings have, in the interest of expedition and a supposed administrative efficiency been relaxed."

Narrowing the question before me still further, it comes to this: Did these secret, *ex parte* contacts influence the judgment of the Board to such an extent that they impaired its independence of judgment and thus deprive plaintiffs of a fair and impartial hearing. In a court of law, the answer would undoubtedly be "Yes" without further ado, but in a proceeding of this kind, with its relaxed informality (which in my opinion invites the conduct herein complained of), per-

haps I should inquire more deeply. Of course, it is unnecessary that I find intentional wrongdoing on the part of anyone, and I do not so find. But before nullifying the Board's decision it should probably be established that there was an intent to influence the Board, as to which there is no doubt; that the contacts were significant, and not trivial, as to which there is likewise no doubt; and that the contacts did influence members of the Board, or were of such a character that it may reasonably be inferred that they did impair, consciously or unconsciously, their independence of judgment. On this last point I likewise find no rational basis for doubt, for the following reasons:

Although the Board members denied being influenced by these contacts, and indeed one testified that he attached no significance to the letter of the Secretary of State, I am not required to give full and unqualified credence to such disclaimers, but should consider them in the light of experience and take into account the frailties and infirmities of human nature. In this connection, I need not explore beyond pointing out the following:

█ As stated herein, two of the Board members, who were contacted and who voted in favor of granting the appeal, were relatively subordinate government employees and the contacts were made by highly placed officers of the Federal and District Governments. If nothing else, these two Board members were made to know that a favorable decision would be pleasing, and an unfavorable decision displeasing, to persons in very high governmental brackets. These officials possess vast power to bestow or not to bestow benefits of various kinds upon subordinate employees. The pressures were not crudely or indelicately exerted. There was no threat or command. There was no promise of reward. But the pressures were nevertheless real, and the Board members contacted could not fail to be aware that they would incur administrative displeasure if they decided the appeal unfavorably. Contacts of this kind, regrettably, are not new.

Some are the products of venality and corruption. Those involved herein were not, and I wish to make that point clear. However, the end result is the same, and the technique does not vary greatly. It involves an assurance that there is no thought of asking the person contacted to do other than his duty, followed by an expression of hope that his duty will incline him in the direction desired. In the vernacular, which is always more picturesque and frequently more expressive than legal jargon, this insidious approach is known as the "soft approach" or "soft touch."

I therefore conclude that the *ex parte*, secret contacts here were of a character which deprived plaintiffs of a fair and impartial hearing.

Perhaps I should add that there might be room or a basis for a different conclusion, if these contacts, verbal and written, had been recorded in the public file for all to see, and for those who desired, to oppose, in the full glare of a public hearing. But that is not the instant case, as no opportunity was afforded the opposition to rebut their impact upon the Board, having the power of decision. And it might not be amiss also to point out that appearance of fairness and impartiality is probably of as great importance as its attainment, if the public is to have confidence in the judicial processes.

While no citation of authority would appear to be necessary to support what I believe to be the self-evident truths above enunciated, I might add that the question here presented has been before the United States Court of Appeals for this circuit within the last few years, but in a slightly different context, and its views are in accord with those herein expressed. The question in the Court of Appeals has arisen on direct statutory appeals from quasi-judicial tribunals, and not on appeal from a judgment of this court invalidating, after hearing, the decision of such tribunal.

Among these recent cases is WKAT v. Federal Communications Commission, 103 U.S.App.D.C. 324, 258 F.2d 418, de-

cided in 1958. There a direct appeal was taken to the Court of Appeals from an award made on applications for a television construction permit. The appellee, Federal Communications Commission, moved to remand the case to the Commission alleging that since the filing of the appeal, charges had been made in the course of a Congressional investigation that one of the Commissioners who had participated in the proceedings before the Commission, but who had since resigned, should have disqualified himself. The Court, in acting on this motion, ordered remand to the Commission with instructions to hold an evidentiary hearing concerning the possibility that the award theretofore made may be void *ab initio* or voidable, and directing that the Commission make findings, including whether any person influenced or attempted to influence any member of the Commission in any manner whatsoever, except by the recognized and public processes of adjudiction. In condemning *ex parte* influence, the Court, after the evidentiary hearing had been held, used this language:

"Surreptitious evidence to influence an official charged with the duty of deciding contested issues upon an open record in accord with basic principles of our jurisprudence, eat at the very heart of our system of government—due process, fair play, open proceedings, unbiased, uninfluenced decision." WKAT, Inc. v. F. C. C., 111 U.S.App.D.C. 253, 296 F.2d 375.

Later in the same year in WORZ, Inc. v. F. C. C., 106 U.S.App.D.C. 14, 268 F.2d 889, there was similarly an appeal from an order of the Commission by a protestant on an application for a construction permit for a television channel. It appeared from the testimony before a subcommittee of Congress that while the case was pending before the Commission certain representations were made to a member of the Commission regarding the qualifications of one of the applicants, and the Court held that the case should be remanded with instructions to hold an evidential hearing to determine the nature and source of all *ex parte* pleas and other approaches made to the Commissioners while the proceedings were pending.

Also in 1958 in Massachusetts Bay Telecasters v. F. C. C., 104 U.S.App.D.C. 226, 261 F.2d 55, the Court directed an evidentiary hearing to determine, among other things, whether any person or persons influenced or attempted to influence any member of the Commission in any manner whatsoever except by the recognized public processes of adjudication. In this case the Court stated that "improper influence, if established, going to the very core of the Commission's quasi-judicial powers is certainly critical."

In 1959 in Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 269 F.2d 221, the Court remanded the case to the Commission when it appeared that *ex parte* presentations were made to various members of the Commission and letters were written to them which did not go into the public record, giving those opposing the views set forth in the letters no opportunity to question the contentions raised in the letters. The Court held that private approaches to members of the Commission vitiated its action and the proceeding must be reopened.

In United Air Lines, Inc. v. C. A. B., 114 U.S.App.D.C. 17, 309 F.2d 238, the court upheld the Board's conclusions that violations of principles of practice did not result in prejudice or deny a fair hearing where the most important communications were placed in the public file and were available to the petitioners if they chose to look.

See also Berkshire Employees Ass'n Etc., v. National Labor R. Bd., 121 F.2d 235 (3d Cir. 1941).

These cases support the conclusions reached herein. However, it would be inappropriate and futile to follow them procedurally and remand this case to the Board for *investigation*. To do so would require the Board to investigate itself, as it has no special examiner to make a factual determination, as suggested by

the Court of Appeals; and further investigation is also unnecessary as that has been done by the Court, in the taking of testimony to determine whether this decision should be nullified.

For the foregoing reasons, I am of the opinion that the decision of the Board in this case should be held to be null and void on the ground that the plaintiffs were denied a fair and impartial hearing and that the case should be remanded to the Board for a new hearing. It would likewise be inappropriate and futile for this case to be *reheard* by the present Board which has already decided it and which has already been under the influence of the contacts referred to. This presents an awkward administrative difficulty, but it does not appear to be insurmountable. A new Board could be created solely for hearing this particular appeal by the designation of two others to replace the two government members who may be designated at the discretion of the respective Commissions, and by the requested resignation of the two non-government members who participated in this appeal and the appointment of two others to replace them. There is now one new member of the Board who did not participate in this appeal who has replaced one of the non-government members who did. This procedure would result in a fresh new Board to hear this appeal. I would apprehend no difficulty about such designations and resignations for such hearing, if it is made clear to the replacements and to those who are replaced that it is for that purpose only and that as soon as the hearing is held and the case is decided the present Board would be reconstituted.

I should add, in order to avoid any possible misunderstanding, that there is no implication in the foregoing that the State Department or any other branch of the Federal or District Government should not be permitted to present its views at this hearing. It has the right and duty to do so when it feels the public interest is involved. But it should proceed by the recognized public processes, either verbal or in writing, and not by secret, covert, *ex-parte* contacts.

In view of the decision herein, it is unnecessary to reach the other points raised by plaintiffs. Counsel will submit on notice judgment in accordance herewith.