**SHERIDAN–KALORAMA NEIGHBOR-
HOOD COUNCIL et al.,
Petitioners,**

v.

**DISTRICT OF COLUMBIA BOARD OF
ZONING ADJUSTMENT, Respondent,**

**The Kingsbury Center, Inc., Intervenor.**

**No. 7934.**

District of Columbia Court of Appeals.

Argued Nov. 26, 1974.

Decided July 3, 1975.

William H. Greer, Jr., Washington, D. C., for petitioners.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, Louis P. Robbins, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Wash-

ington, D. C., were on the brief, for respondent.

Charles R. Donnenfeld, Washington, D. C., with whom Earl M. Colson, Washington, D. C., was on the brief, for intervenor. Rodney F. Page, Washington, D. C., entered an appearance for intervenor.

Before REILLY, Chief Judge, YEAGLEY, Associate Judge, and BELSON, Associate Judge, Superior Court of the District of Columbia.*

BELSON, Associate Judge:

Petitioners are the Sheridan-Kalorama Neighborhood Council and three residents of that neighborhood. They seek judicial review of the action of the respondent, Board of Zoning Adjustment (hereinafter "Board"), granting a special exception in favor of intervenor, Kingsbury Center, Inc., to permit it to expand a small private school it operates in the neighborhood. Petitioners assert that reversal and remand or other relief are necessitated by procedural irregularities in the manner in which the application for exception was processed by the Board and the Zoning Commission (hereinafter "Commission"). We disagree and affirm the order of the Board.

Kingsbury Center established the "Lab School" in 1967 to assist children who have a unique reading problem known as dyslexia. It has served a total of 77 pupils at the elementary level since then and has a current enrollment of 36. It operates as a day school for dyslexic children who live in their home throughout the metropolitan area but principally in the District of Columbia. The children are of average intelligence or above but require special educational techniques. The school is located at 1807–09 Phelps Place, N.W. In 1973 it purchased the premises 1803 Phelps Place, a townhouse at that time used as a private residence, so that it might accommodate those members of its student body who are not prepared to return to regular schools when they have completed the elementary level program. The structure was acquired to accommodate seventh and eighth grade classes having a total enrollment not exceeding 18 and two teachers.

If expanded as requested, the school would operate on both sides of the private residence of petitioner Katherine Frost.[1] While many residents of the immediate area joined Mrs. Frost in opposing the school's application, by far the greater number of persons expressing their views supported it. The petitioning Neighborhood Council by its executive committee considered the application and concluded to take a position neither for nor against it provided certain qualifications were imposed.[2]

The neighborhood in question is zoned R–3. A private school may be granted an exception permitting it to locate in an area so zoned provided certain conditions are met.[3] The Board held a public hearing on intervenor's application on May 16, 1973. Six days later it met in executive session and voted unanimously to deny the special exception. The petitioners' principal assertion is that the acts and events which

---

* Sitting by designation pursuant to D.C.Code 1973, § 11–707(a).

1. Although Mrs. Frost submitted vigorous written opposition to the expansion on the basis of the aforementioned isolation of her home and other aspects of the school operation which she considers incompatible with the single-family residential use contemplated by the neighborhood's R–3 zoning, she did not appear and testify.

2. The Council requested that (1) the number of pupils be limited to no more than 18 and the number of teachers to two and (2) the special exception be limited to temporary approval for a period of three years, at the end of which the Board would review its decision at a public hearing in order to determine if the Lab School operation at 1803 Phelps Place, N.W., had proven objectionable under § 3101.42 of the Zoning Regulations of the District of Columbia.

3. Zoning Regulations §§ 3101.42(b) and 8207.2.

eventually transformed that tentative vote into a three-to-two vote in favor of granting the exception were such as to deprive them of procedural due process. They maintain that the irregularities require either that the original tentative vote be given final effect or that the order under review be reversed and the application submitted to a specially created board or, alternatively, to a special master who would ascertain what actually brought about the change in the voting and would prepare and submit to this court a report on the issues of "ex parte influence" and "pressure."

It is significant that the Board's initial vote of May 22, 1973, to deny the exception was not final. No order issued upon it. Instead the Board met again on June 26, 1973, and voted four to one to grant the exception. Petitioners' claim of fatal irregularities rest entirely upon occurrences which took place between the tentative vote to deny of May 22, 1973, and the contrary vote of June 26, 1973. We shall, therefore, set forth in some detail the events of that period. The record establishes that Mr. Arthur B. Hatton, who at the times pertinent to this case served both as a member of the Board of Zoning Adjustment and as Executive Director of the Zoning Commission, was present at a meeting of the Commission on June 1, 1973. According to a file memorandum he later prepared, he was there questioned by members of the Commission as to how the Board's tentative unanimous vote to deny the exception had become public knowledge. He responded that he did not know. He was then given to understand that the Commission "might wish to review the action" of the Board. A somewhat more complete recital of what happened is set forth in the Supplemental Findings of Fact and Conclusions of Law,[4] in which it is recited:

During the interim between the first and second votes of the Board prior to issuance of the minutes, the application was the subject of some newspaper publicity, which included a report on the initial decision to deny. At the subsequent meeting of the Board on June 26, one of its members, who also served as Executive Director of the Zoning Commission, reported to the Board that at its executive meeting, the Commission has expressed some concern over the reported action. It was also conveyed to the Board by this member that a final order *denying* the application would be reviewed by the Commission pursuant to Section 8204.3 of the Regulations. The comments regarding the Zoning Commission, while resented by some of the Board members, had no effect on the final vote on the merits of this application. Furthermore, the members of the Board voting with the majority have not been improperly pressured or otherwise influenced during the deliberations on this case. [Emphasis added]

More details were entered in the record by inclusion of a Washington Post article of June 27, 1973, § C, at 8, which, relying largely on "sources," reported in pertinent part:

City Council Vice Chairman Sterling Tucker told that meeting [of the Zoning Commission] he intended to seek a stay of the board of zoning adjustment's ruling.

In ruling against the Kingsbury proposal to add 12 children to its rolls, the board was deciding policy rather than on the basis of facts presented in the case, and going beyond its authority, Tucker said.

Tucker also said he would ask the zoning commission to review the policy of the impact of school children on a neighborhood, regardless of the decision in the Kingsbury case.

Other than the foregoing, no instances of "ex parte" contacts with or external pres-

4. Issued on November 16, 1973.

sures upon the Board are reflected in the record or suggested by the petitioners.

The June 26, 1973 vote of the Board in favor of the granting of the exception was reflected in an order of August 23, 1973. Board Member Lilla Burt Cummings dissented on the basis, *inter alia,* that the Zoning Commission's actions described above constituted "ex parte contacts and pressures from 'upstairs,'" procedural irregularities which deprived the parties of due process. On August 28, 1973, the Commission stayed the Board's order of August 23, 1973. It then remanded the matter to the Board on September 14, 1973, so that it might be furnished, *inter alia,* supplemental findings of fact and conclusions of law and in so doing stated:

> The Zoning Commission has the discretion under Sections 8204.3, 8204.4 and 8204.5 of the Zoning Regulations to review final Orders of the Board of Zoning Adjustment and has undertaken to review this Order solely under those provisions. The Zoning Commission states that there was no intent or attempt to influence the independent decision-making process of the Board of Zoning Adjustment, nor should such an intent or attempt be attributed to this Order. [Zoning Commission Order No. 72, Case No. 73-25, September 14, 1973.]

During the period prior to the Board's compliance with the order of remand, the Office of the Corporation Counsel advised all Board members to comment upon the charges made in Member Cummings' dissent. The Board's final order of November 16, 1973, contained the above-quoted statement by the majority of three that they had not been subjected to any improper pressure or contacts. Chairman Samuel Scrivener, who dissented from the Board's decision on grounds other than those raised by Member Cummings, responded to the Corporation Counsel's advice by stating that he had not been subjected to any pressure and by suggesting that such a charge ought

not be made "without documenting it and stating which members of the Board have been subjected to such pressures". The second dissent of Member Cummings, issued on November 6, 1973, furnished no additional factual information concerning her allegations of ex parte contacts with or pressures brought to bear upon the Board.

■ The foregoing makes it clear that we are not called upon merely to perform the review function routinely performed by appellate courts in connection with actions of administrative agencies, that is, to determine "whether the decision reached . . . follows as a matter of law from the facts stated as its basis, and also whether the facts so stated have any substantial support in the evidence." *Saginaw Broadcasting Company v. Federal Communications Commission,* 68 App.D.C. 282, 287, 96 F.2d 554, 559 (1938); *quoted with approval in Stewart v. District of Columbia Board of Zoning Adjustment,* D.C.App., 305 A.2d 516, 518 (1973). We are satisfied that the Board's order is not subject to challenge in that respect. Instead our inquiry must focus on whether the contacts between the Commission and the Board suggested by the record were improper ex parte contacts and whether the petitioners were denied due process if we assume the worst suggested by petitioners—that one or more members of the Zoning Commission expressed to their Executive Director, Board Member Hatton, and through him to other Board members, an unfavorable attitude toward the then tentative ruling of the Board denying the exception.

■ In reaching our conclusion that the Board's order should be upheld we are mindful that Board proceedings must be characterized by fundamental fairness and that the Board must be diligent to assure that its deliberations are attended by both the substance and the appearance of impartiality. That our inquiry leads us to affirm is, at base, the result of our consideration of two factors: the first is that

the communication in question must be viewed against the background of the unusual relationship between the Zoning Commission and its semi-autonomous adjunct, the Board of Zoning Adjustment; the second is that developments which took place after the communication in question guaranteed that Board members were in a position to exercise independence of judgment in voting upon the intervenor's application.

█ The relationship between the Commission and the Board is far different from that which exists between trial and appellate courts and from that which typically obtains between administrative law judges and the bodies which are authorized to review their rulings. The various tiers of the customary review structure are independent of one another. The Board, however, is not independent of the Commission. A brief review of the history of those bodies, the functions assigned them, and their relationship to one another will assist in placing in perspective the issues raised by petitioners.

Congress established a Zoning Commission for the District of Columbia in 1920.[5] Included among its powers is that of dividing the District into zones of such number, shape, and area as it deems appropriate. Within such zones it is assigned the policy-making function of regulating, *inter alia,* the construction, maintenance, and uses of buildings and structures and the uses of land.[6]

In 1938 Congress created the Board of Zoning Adjustment.[7] Pursuant to regulations promulgated by the Zoning Commission, it has been given authority to pass upon requests for special exceptions to the limitations upon the construction or use of buildings or land imposed by the Zoning Commission within the various zones it created. As stated by Judge Pine in *Jarrott v. Scrivener,* 225 F.Supp. 827, 830 (D.D.C.1964), the Board "is an adjunct of, and in a sense complimentary to, the Zoning Commission." The statute creating the Board expressly provides that one member thereof shall be a member of the Zoning Commission or a member of the staff thereof which the Commission designates and that the Zoning Commission member of the Board serves, in effect, at the pleasure of the Commission.

█ It is against this statutory background that we must examine the pattern of contacts which occurred between the Commission and the Board. Most striking is the fact that one member or other representative of the Commission is to be a member of the Board. Thus, the member of the Commission whose statement is cited by petitioners, Mr. Tucker, might himself have been in a position to express at a Board meeting the view ascribed to him in the above-quoted newspaper article that the proposed denial of the exception in question was based upon a policy decision which the Board had no authority to make. Moreover, Congress obviously contemplated that the Zoning Commission

---

5. Act of March 1, 1920, Pub.L. No. 153, 41 Stat. 500; D.C.Code 1973, § 5–412. At the times pertinent to this proceeding the Commission's membership included the Commissioner of the District of Columbia, the Chairman and the Vice Chairman of the District of Columbia Council, the Director of the National Park Service, and the Architect of the Capitol.

6. D.C.Code 1973, § 5–413.

7. Act of June 20, 1938, Pub.L. No. 684, 52 Stat. 799, D.C.Code 1973, § 5–420. At the times pertinent to this proceeding the Board's membership included one member of the National Capital Planning Commission or a staff member thereof, one member of the Zoning Commission or a staff member thereof, and three other members appointed by the Mayor-Commissioner who had been residents of the District for three years prior to their appointment and one of whom owned his home.

member of the Board would be in regular contact with other Commission members and be made aware of their views not only as to matters actually pending before the Commission but also as to matters of general policy. If a Commission member feels that the Board is usurping the policy-making function of the Commission, a view which was said to have been entertained by Mr. Tucker in this instance,[8] that member has every right to communicate his apprehension to his fellow Commission members and, by dint of the statutory scheme which has placed a Commission member or designee on the Board, to make ·his views known to the Board as well. The communication of such views concerning the instant matter to the Board would have been, therefore, neither improper nor ex parte. Expressions of the sort in question are clearly foreseeable under the statutory plan, and it is equally forseeable that some parties to those exchanges will be commenting without the benefit of a prior examination of a full record. Congress intended that there exist an open channel for communication between the Zoning Commission and the Board. Member Hatton was the person designated by the Commission to represent it on the Board, and he was authorized to express the Zoning Commission's concerns and to cast his vote with full knowledge of the attitudes and policy positions of the Commission's members. He was, of course, bound to cast a vote based exclusively upon the record of proceedings before the Board,[9] and he states that he did so in the case before us. There is, in our view, no essential conflict between serving as the Zoning Com-

mission member of the Board and casting a vote based exclusively upon the record before it.

 In ruling as we do, we recognize that the channel for communication between Commission and Board can become a conduit for pressures external to the Zoning Commission, an abuse which may invalidate a Board decision. If any such communication should occur, it must be made a part of the public record, so that interested parties may comment. Moreover, the very existence of the exceptional relationship between the Commission and the Board delineated above suggests that the Zoning Commission member of the Board should be circumspect in the manner in which he expresses to other Board members the institutional interest the Commission has in seeing to it that the Board does not trespass upon the policy-making area reserved to the Commission. The Commission member of the Board will enhance public confidence in the Board's impartiality by articulating the basis for any view that the Board is exceeding its authority and by expressing it in such fashion as to give interested parties opportunity to comment.

The matter of the fairness of Board proceedings was discussed in *Jarrott v. Scrivener, supra,* a precedent heavily relied upon by petitioners. There, certain Commission members transmitted to Board members the clearly expressed wishes of high government officials. Two members of the Board were subordinate government officials. In

---

8. The tentative vote to deny was based primarily upon the adverse cumulative effect of authorizing the presence of an additional 18 students in a neighborhood which already contained numerous private schools. The record suggests that the Board was prepared to adopt the view that since the neighborhood has reached a point of saturation with students no further exceptions for private schools should be granted. Action based upon that premise can arguably be viewed as an abdica-

tion by the Board of its responsibility for examining each application on its merits and as an invasion of the policy-making function of the Commission.

9. *Quick v. District of Columbia Department of Motor Vehicles,* D.C.App., 331 A.2d 319, 322 (1975) ; *Dietrich v. District of Columbia Board of Zoning Adjustment,* D.C.App., 320 A.2d 282, 287 (1974) ; *see also* D.C.Code 1973, § 1–1501 *et seq.*

addition, the President's Advisor for National Capital Affairs (not a member of the Zoning Commission) made a telephone call to the Chairman of the Board and reiterated the interest of the federal government in the granting of the exception at issue, which would have permitted construction of the Russian Embassy and Consulate on the "Bonnie Brae" estate. The numerous contacts between high federal and District officials on the one hand and Board members on the other were not matters of record as of the time of the challenged action of the Board granting the exception. Indeed, the existence of a letter from the Secretary of State supporting the exception was not made known to those opposing it and the letter was "deliberately" omitted from the file at the request of the Engineer Commissioner. *Jarrott v. Scrivener, supra* at 832. In ordering a remand to a specially constituted board, Judge Pine stated:

> Perhaps I should add that there might be room or a basis for a different conclusion, if these contacts, verbal and written, had been recorded in the public file for all to see, and for those who desired, to oppose, in the full glare of a public hearing.[10]

■ In the proceeding under consideration here, four highly relevant developments followed Member Hatton's indication that the Commission would review a denial of intervenor's application. They were: 1) Board Member Cummings' vigorous dissent of August 22, 1973, in which she expressed her apprehension that improper pressure had been brought to bear from "upstairs," i. e., the Commission, 2) the Commission's order of remand of September 14, 1973, quoted in part above, which disavowed any intention on the part of the Commission "to influence the independent decision-making process of the Board," 3) the advice of the Corporation Counsel that Board members should comment on the dissent's charge of pressure, and 4) the Board's final order of November 16, 1973 which, unlike the tentative vote for denial of the application,[11] was based upon the criteria made applicable by the Zoning Regulations. *Jarrott*, therefore, is readily distinguishable from the instant case not only because the Commission member was here expressing a legitimate institutional interest in what was arguably a usurpation of a Commission function, but also by reason of the substantial differences in the manner in which the Board and Commission acted in the two cases. After a careful study of the voluminous record, we conclude not only that the statutory scheme for processing zoning exceptions was adhered to, but also that petitioners were afforded a fair and impartial hearing which satisfied the requirements of procedural due process.

■ We find no merit in the petitioners' other principal contention, *viz.*, that the Commission exceeded its powers by assuming both the authority to review a matter regardless of whether any party appealed and the authority to remand. Existing regulations afford no right to appeal to the Commission from an unfavorable ruling by the Board. The Commission has adopted regulations authorizing it to review Board action on its own motion, an authority which was exercised here.[12] Since in this case two of the petitioners did in fact communicate to the Commission their dissatisfaction with the Board's action almost simultaneously with the Commission's deci-

10. *Jarrott, supra* at 834.

11. *See* note 8 *supra.*

12. Zoning Regulations §§ 8204.3–8204.5. The Zoning Commission has been made aware that its present provisions for review are wanting and may be the source of future litigation unless improved. *Dietrich, supra* at 290, dissenting opinion of Judge Harris.

sion to review,[13] petitioners are not in a position to claim prejudice as a result of this action by the Commission or this feature of its regulations. Nor were petitioners prejudiced, as they claim, by the Commission's remand to the Board of its first published order, findings of fact and conclusions of law. The order in question was adverse to petitioners' position and had been approved by a four to one vote. A principal purpose of the remand was to require the clarification. of the basis for the majority vote. Petitioners should not be heard to complain that they were prejudiced by a Commission action favorable to them. The decision of the Board is therefore

*Affirmed.*

13. By letter dated August 27, 1973, petitioners Stellita S. Renchard, John M. Courtney and Elaine Dym requested a stay of Order No. 11365. This letter was stamped received August 30, 1973, Zoning Office, D.C. The Commission, by order dated August 28, 1973, stayed for a period of 90 days the Board's original order granting intervenor's application.