[No. B136421. Second Dist., Div. Four. Sept. 7, 2000.]

GOLDEN DAY SCHOOLS, INC., Plaintiff and Appellant, v.
STATE DEPARTMENT OF EDUCATION, Defendant and Respondent.

696

## COUNSEL

Gibson, Dunn & Crutcher, James P. Clark, Gregory L. Doll and Joel Scott for Plaintiff and Appellant.

Linda A. Cabatic, Joanne Lowe and Carolyn Pirillo for Defendant and Respondent.

## OPINION

**EPSTEIN, J.**—In this case we determine that a child care contractor with the state, debarred by the state administering agency from applying for further contracts for three years, has a due process liberty interest entitling it to a hearing on justification for the debarment. The hearing must be before an impartial arbiter or tribunal. The contractor in this case had a hearing, but not before an impartial tribunal. Since the trial court denied its petition for relief, we shall reverse with directions that an appropriate order be entered directing that the state agency provide the contractor with the hearing to which it is constitutionally entitled.

### FACTUAL AND PROCEDURAL SUMMARY

Appellant Golden Day Schools, Inc., is a California nonprofit corporation that, for over 35 years, has operated child care programs in the City of Los Angeles. For a number of years it has done so under contracts awarded annually by respondent State of California. The administering agency for the state is the State Department of Education, and, for convenience, we shall refer to respondent as the Department. Appellant's funding level from the Department, at the time its contract was not renewed, was approximately $3 million a year. According to its president, it was caring for some 700 to 800 children a day.

The Child Care and Development Services Act is a lengthy and comprehensive statute governing the child care program in which appellant is engaged, as well as many other programs. Enacted in 1976, the statute is at Education Code section 8200 et seq. (All further undesignated citations to California statutes are to this code.) A principal purpose of the statute is to "provide a comprehensive, coordinated, and cost-effective system of child care and development services for children to age 14 and their parents, including a full range of supervision, health, and support services through full- and part-time programs." (§ 8201, subd. (a).) The programs are administered through the Department, and take advantage of federal funding provided through the Omnibus Budget Reconciliation Act of 1990 (Pub.L. No. 101-508 (Nov. 5, 1990) 104 Stat. 1388-236). (§§ 8206-8206.8.)

Article 18 of the statute (§ 8400 et seq.) provides for administrative review of disputes between contractors selected to provide services under the program and the Department. In this article, the Legislature has declared its intent to authorize an appeal process for resolution of such disputes. (§ 8401.) In cases where the Department proposes to suspend a contract during its term, and in specified other situations, a full Administrative Procedure Act hearing, under the auspices of the Office of Administrative Hearings, is allowed. (§§ 8402-8405.) The administrative action in this case does not fall within those provisions.

In this case, the administrative action was to refuse to offer appellant a new annual contract upon expiration of the contract under which it was then operating. The Department's actions, and its provision for review, are taken pursuant to the regulations adopted by the Department, in title 5 of the California Code of Regulations. (Hereafter Regulation; all regulations discussed here are in that title.)

Regulation section 18002 sets out a system for persons to apply for a contract to provide child care services. Regulation section 18001 provides, in subdivision (b), that a contractor "is not eligible for additional funds if the contractor has demonstrated fiscal and/or programmatic noncompliance and has received final notification, as specified . . . ."

Regulation section 18010, subdivision (a) states that "[c]ontractors have no vested right to a subsequent contract." Regulation section 18303 governs changes in the contract status of a child care contractor. Upon an appeal by a dissatisfied contractor, an administrative review panel is appointed. The panel is made up of "representatives of Child Development Division management and the State Department of Education's Local Assistance Bureau,

Legal Office, Office of External Audits and Contracts Office and a representative of a child care and development service provider familiar with the type(s) of programs(s) operated by the contractor." Upon review of written submissions, the panel is to take one of the following actions:

"(1) Issue a final decision holding or modifying the proposed change in status if no oral presentation has been requested; or

"(2) Schedule a time and place for an oral presentation by the contractor.

"(3) Issue a final decision to not change the contract status." (Reg., § 18010, subd. (d).)

The regulation also provides:

"(e) If an oral presentation has been requested, the contractor will be notified by telephone of the time and place of the presentation. The oral presentation will be scheduled no later than fourteen (14) calendar days from receipt of the contractor's response.

"(f) At the oral presentation, the contractor or the contractor's representative will have an opportunity to explain any material submitted in its response. While the contractor may present any information or arguments that are relevant to the proposed action, the review panel may set reasonable limits on the scope of the presentation.

"(g) Within seven (7) calendar days after the oral presentation, the review panel shall issue and mail to the contractor a decision upholding, reversing or modifying the proposed change in contract status. The decision of the review panel shall be the final action of the State Department of Education with regard to that contract."

Regulation section 18001, subdivision (c) is the debarment provision. It states: "An applicant is not eligible for funding if it has had a prior contract with the State Department of Education for child care and development services within three (3) years immediately preceding the date of the Request for Applications and: [¶] (1) the contract was terminated for fiscal and/or programmatic noncompliance; or [¶] (2) the contract funding was not continued because of fiscal and/or programmatic noncompliance."

The statute, in section 8448, provides for annual audits to be submitted by all contractors. Section 8406.6 sets out a system of contract classification. A "Clear contract" is a designation given to contractors that are in full compliance with all statutory provisions, funding terms and conditions, and

applicable program quality guidelines. (§ 8406.6, subd. (a).) A "Conditional contract" is a designation applicable to "high-risk contracted agencies that evidence fiscal and or programmatic noncompliance." (§ 8406.6, subd. (c).) These contractors are subject to restrictions imposed to secure compliance, and the conditional contract is to include a bill of particulars detailing items of noncompliance, standards that must be met to avoid contract termination, and a technical assistance plan. (*Id.*, subd. (c).) Regulation section 18010, subdivision (c), provides that contractors on conditional status that do not meet the requirements of the conditional status addendum may not be offered a new contract. (*Ibid.*)

After receiving contracts under the statute for many years, appellant ran into problems during the 1997-1998 fiscal year. It was informed that the audit reports for three fiscal years (1994-1995, 1995-1996 and 1996-1997) were deficient. In 1998, after availing itself of the hearing procedure of regulation section 18303, appellant was given a new annual contract, but was placed on conditional status. A Department review of revised audit reports submitted by appellant for the three years yielded a determination that the reports were "unacceptable." A notice of proposed action (NOPA) was issued by the Department, indicating the staff position that appellant not be offered a new contract once its contract then in force ran out, on June 30, 1999. Pursuant to appellant's request, the Department held a hearing in Sacramento. Appellant appeared at the hearing through its president, Dr. Clark Parker, and two certified public accountants.

Dr. Parker had received notification of the persons who would comprise the panel. He submitted an objection to one of them, Glenn Ostapeck. Mr. Ostapeck was director of the Audits and Investigation Division of the Department agency concerned with child care programs. It was he who determined that appellant's audits were "unacceptable." His decision led to the NOPA not to renew appellant's contract. Dr. Parker argued then, and since, that it is not fair to have the person who initiated the administrative decision not to renew appellant's contract serve as a member of the panel that would determine his appeal of that decision. Nevertheless, Mr. Ostapeck served on the panel.

There were four other voting members of the panel: a member of the Department's Education Finance Division, a private contractor (Paul Miller), a deputy general counsel of the Department (Carolyn Pirillo), and a member of the Department's Office of External Audits. Later, and on appeal, appellant also objected to the private contractor and the deputy general counsel as members of the panel.

In a declaration submitted to the court in support of its application for administrative mandate under Code of Civil Procedure section 1094.5, Dr. Parker declared that "at the conclusion of the administrative hearing, the other Panel members stated, off the record, that they would defer to Mr. Ostapeck's judgment regarding the acceptability of any revised audits submitted by Golden Day." In an opposing declaration to the mandate petition, Ms. Pirillo stated that during a discussion after the close of the hearing, "No one said they would defer their judgment to OEA and not fulfill their responsibility as members of the statements that Administrative Review Panel." (This is apparently a reference to the Office of External Audits— sometimes named the Audits and Investigation Department, or AID. Whatever its name, it was headed by Mr. Ostapeck.) It will be noted that Ms. Pirillo's statement does not squarely refute Dr. Parker's declaration, which states that panel members said they would defer to Mr. Ostapeck (rather than to a bureau). His statement stands unrefuted.

On March 25, 1999, the Department, through the panel, sent notification to appellant of its final action: that appellant's revised audits were still unacceptable and that he would not be offered a contract for the ensuing year, resulting in an end to Department funding and the contract on June 30, 1999.

Appellant filed its petition for judicial relief three months after that. It was opposed by the Department, and was denied in August 1999. In its statement of decision, the court stated that appellant had failed to establish either of the grounds it urged: that it was not given a fair hearing, or that the panel abused its discretion in not offering funding beyond the 1998-1999 fiscal year. The court also concluded that appellant was not entitled to a more formal administrative hearing under section 8402, and that it had no vested right to continued funding. The court found no abuse of discretion by the panel but found, instead, that the panel's decision is supported by the finding that appellant had not submitted acceptable organization-wide audit reports or an acceptable indirect cost plan for the three fiscal years under review. Judgment was for the Department, and appellant has appealed.

### DISCUSSION

 Appellant has declared, more than once, that all it is seeking is a fair hearing. That request frames the issue before us: the hearing to which appellant is entitled, and whether it received it. We shall not address the merits of the audit reports—whether they met the Department's requirements or not and, if not, the extent and significance of the deficiencies. And, as we

shall explain, appellant's constitutional entitlement is based on the debarment—its declared ineligibility from being considered for a contract at any point during the three-year period following the panel's decision. If appellant has a liberty interest at all in this matter, it is from that debarment, not from the Department's refusal to offer a contract for the ensuing year. We say this at the outset because so much of the briefing of the parties focuses on issues not germane to the due process questions before us.

## I

The debarment provision is in regulation section 18001, subdivision (c). The parties do not dispute that the hearing panel's decision triggers debarment, because it is based on "fiscal and/or programmatic noncompliance." We find no explicit provision for debarment in the statute, but we shall assume for purposes of this appeal that the Department is authorized to debar by the broad grant of administrative and rulemaking authority given it in the enabling statute. (See, e.g., § 8261 [authority to adopt rules and regulations]; *Coca-Cola Co. v. State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1] [contemporaneous construction of statute by agency charged with its enforcement and application is entitled to great weight]; *Gonzalez v. Freeman* (D.C. Cir. 1964) 334 F.2d 570, 576 [118 App.D.C. 180] [federal contracting agency had implied authority to debar].) No argument was presented to the contrary.

Does debarment from eligibility to bid or apply for public contracts implicate an interest protected by the due process clause of the federal Constitution? The answer depends on an understanding of what debarment is and what it entails, and on the liberty and property aspects of the constitutional provision.

## II

" 'Debarment' and 'suspension' are sanctions that exclude an individual or entity . . . from doing business with the . . . government. These sanctions are imposed upon persons who have engaged in wrongful conduct or who have violated the requirements of a public contract or program. A debarment excludes a person from doing business with the government for a defined period, usually some number of years. . . . A suspension is a temporary exclusion which is imposed upon a suspected wrongdoer pending the outcome of an investigation and any ensuing judicial or administrative proceedings." (Gordon, *Suspension and Debarment From Federal Programs* (1994) 23 Pub. Cont. L.J. 573, 574 (Gordon).)

Debarment is never a matter of small moment. As Warren Burger, then Chief Judge of the District of Columbia Circuit, described it: "The consequences of administrative termination of all right to bid or contract, colloquially called 'blacklisting' and formally called suspension or debarment,

will vary, depending upon multiple factors: the size and prominence of the contractor, the ratio of his government business to non-government business; the length of his contractual relationship with government; his dependence on that business; his ability to secure other business as a substitute for government business. . . . The impact of debarment on a contractor may be a sudden contraction of bank credit, adverse impact on market price of shares of listed stock, if any, and critical uneasiness of creditors generally, to say nothing of 'loss of face' in the business community. These consequences are in addition to the loss of specific profits from the business denied as a result of debarment. We need not resort to a colorful term such as 'stigma' to characterize the consequences of such governmental action, for labels may blur the issues. But we strain no concept of judicial notice to acknowledge these basic facts of economic life." (*Gonzalez v. Freeman, supra,* 334 F.2d 570, 574, fn. omitted (*Gonzalez*); see also *Goldberg v. Kelly* (1970) 397 U.S. 254, 264 [90 S.Ct. 1011, 1018, 25 L.Ed.2d 287], in which the Supreme Court referred to "the blacklisted government contractor.")

But despite its severe impact on contractors, debarment is not intended as punishment. It is, instead, a necessary means to enable the contracting governmental agency to deal with irresponsible bidders and contractors, and to administer its duties with efficiency. (See *Gonzalez, supra,* 334 F.2d at p. 577.)

■ " 'Liberty' and 'property,' " the twin interests protected by constitutional due process, "are broad and majestic terms. They are among the '[g]reat [constitutional] concepts . . . purposely left to gather meaning from experience. . . . [T]hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged.' " (*Board of Regents v. Roth* (1972) 408 U.S. 564, 571 [92 S.Ct. 2701, 2706, 33 L.Ed.2d 548] (*Roth*), quoting *National Ins. Co. v. Tidewater Co.* (1949) 337 U.S. 582, 646 [69 S.Ct. 1173, 1209, 93 L.Ed. 1556] (dis. opn. of Frankfurter, J.).)

■ The property aspect of due process is easily addressed: there is none in this case. "[T]he right to bid on a contract is not a property right." (*Dentom Transp. v. Human Resources Admin.* (1992) 155 Misc.2d 31 [588 N.Y.S.2d 713, 717]; *Stacy & Witbeck, Inc. v. City and County of San Francisco* (1995) 36 Cal.App.4th 1074, 1086, fn. 6 [44 Cal.Rptr.2d 472].) The appellant in this case did not have, and does not claim, a property interest in having its child care contract renewed for the 1999-2000 year. We turn to its liberty interest.

■ In *Roth,* the court repeated its much earlier observation, in *Meyer v. Nebraska* (1923) 262 U.S. 390, 399 [43 S.Ct. 625, 626-627, 67 L.Ed. 1042,

29 A.L.R. 1446], that liberty interests guaranteed by the Fourteenth Amendment have not been defined with exactness, and denote far more than freedom from bodily restraint; they extend to " 'the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.' " (*Roth, supra*, 408 U.S. at p. 572 [92 S.Ct. at p. 2707].)

The *Roth* case involved the rights of a probationary professor at a public university whose contract was not renewed for a one-year term. It would stretch the concept of liberty too far to say that a person is deprived of the constitutional protection when he simply is not rehired in one job but remains free to seek another. (*Roth, supra*, 408 U.S. at p. 575 [92 S.Ct. at p. 2708].) Nevertheless, the court recognized, a "different case" might be presented if the nonrenewal was carried out in such a manner as to implicate a protected liberty interest, such as a decision not to rehire based on seriously damaging charges against the employee, or a decision that imposed a "stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." (*Id.* at p. 573 [92 S.Ct. at p. 2707].)

The suggestion in *Roth* that government action that stigmatizes an individual amounts to a violation of that person's liberty interests was limited in later decisions. In *Paul v. Davis* (1976) 424 U.S. 693 [96 S.Ct. 1155, 47 L.Ed.2d 405], police distributed a flyer describing Davis as an "active shoplifter." Davis sued, claiming a violation of his liberty interests. The court held that stigma alone is not enough; some change in the legal status of the person defamed also must occur. (*Id.* at p. 712 [96 S.Ct. at pp. 1165-1166].) More recently, in *Siegert v. Gilley* (1991) 500 U.S. 226 [111 S.Ct. 1789, 114 L.Ed.2d 277], the court modified this "stigma plus" approach. The lawsuit in that case flowed from a negative recommendation letter written by a former supervisor in the government agency in which Siegert was employed. Siegert argued that the combination of the allegedly malicious letter and his impaired ability to retain government employment satisfied the requirements of a constitutional liberty interest. He was not successful. Although the negative letter damaged his reputation and impaired future employment prospects, it was written several weeks after Siegert had resigned his position. (*Id.* at p. 233 [111 S.Ct. 1789, 1793-1794].)

One observer has suggested that *Siegert* "may cast doubt on lower court opinions that held that a suspension or debarment implicates a contractor's protected liberty interests." (Shannon, *Debarment and Suspension Revisited: Fewer Eggs in the Basket* (1995) 44 Cath. U. L.Rev. 363, 398

(*Shannon*).) *Siegert* may signal a retrenchment, but, as we read the cases, government debarment continues to implicate a liberty interest. It is the right to be considered for, not to receive, a government contract. As summarized by another observer, "Commencing with the seminal decision of the D.C. Circuit in Gonzalez v. Freeman, . . . a series of federal court decisions has established that a person facing suspension or debarment has a constitutionally protected liberty interest at stake and, therefore, is entitled to certain procedural protections as a matter of due process of law. . . . One who has been dealing with the government on an ongoing basis may not be blacklisted, whether by suspension or debarment, without being afforded procedural safeguards including notice of the charges, an opportunity to rebut those charges and, under most circumstances, a hearing." (Gordon, *supra*, 23 Pub. Cont. L.J. at p. 591, citing *Transco Sec., Inc. of Ohio v. Freeman* (6th Cir. 1981) 639 F.2d 318, 321.)

The *Gonzalez* decision is acknowledged as the leading case for the proposition that debarment implicates a due process interest. (See *Shannon, supra*, 44 Cath. U. L.Rev. at p. 386.) The case involved debarment of persons from contracting with the Commodity Credit Corporation, a federal agency. The court recognized that it is correct "broadly speaking, to say that no citizen has a 'right,' in the sense of a legal right, to do business with the government." (*Gonzalez, supra*, 334 F.2d at p. 574.) But that truism does not end the matter. "Of course there is no such *right*; but that cannot mean that the government can act arbitrarily, either substantively or procedurally, against a person or that such person is not entitled to challenge the processes and the evidence before he is officially declared ineligible for government contracts." (*Ibid.*) Because of this, the contractor presented a justiciable controversy to the court, which concluded that on the record before it there was "neither the appearance nor the reality of fairness in the process by which debarment . . . was accomplished. Disqualification from bidding or contracting for five years directs the power and prestige of government at a particular person and, as we have shown, may have a serious economic impact on that person. Such debarment cannot be left to administrative improvisation on a case-by-case basis. The governmental power must be exercised in accordance with accepted basic legal norms. Considerations of basic fairness require administrative regulations establishing standards for debarment and procedures which will include notice of specific charges, opportunity to present evidence and to cross-examine adverse witnesses, all culminating in administrative findings and conclusions based upon the record so made." (*Id.* at p. 578, fn. omitted.) The court concluded that Congress could have not intended the agency to act without these minima of fair process, for "to reach any other conclusion would give rise to serious constitutional issues." (*Id.* at p. 579.)

This conclusion is a strong indication that the court considered debarment to implicate due process issues. A later decision by the same court squarely holds that it does. (*Old Dominion Dairy v. Secretary of Defense* (D.C. Cir. 1980) 631 F.2d 953, 962 [203 App.D.C. 371].) In that case a government auditor had determined that a particular contractor had shown "a lack of business integrity." Because of that determination, the contractor's low bids were rejected and the contracts awarded to another. It was only then that the contractor learned of the disparagement. The court held that the contractor had a cognizable liberty interest in the procedures used in its effective debarment. (*Ibid.*) This interest entitled the contractor to notice of the charges and an opportunity to contest them before its bids were rejected. The contractor did not seek a hearing, but only that it be notified and have an opportunity to convince the agency that the allegations against it were without merit. Perhaps because of this limitation in its request, the court did "not suggest that the Government was required to afford the contractor any type of a formal hearing." (*Id.* at p. 968.)

Many other cases conclude that government debarment of a contractor, at least one that has an established record of doing business with the government, implicates a liberty interest. (See, e.g., *Girard v. Klopfenstein* (9th Cir. 1991) 930 F.2d 738, 743; *Kartseva v. Department of State* (D.C. Cir. 1994) 37 F.3d 1524, 1527 [308 App.D.C. 397] [analysis of cases through *Siegert*, concluding that government action that potentially constrains future employment opportunities and which involves tangible change in status is actionable under due process clause]; *Taylor v. Resolution Trust Corp.* (D.C. Cir. 1995) 56 F.3d 1497, 1506 [312 App.D.C. 427] [similar]; *Transco Sec., Inc. of Ohio v. Freeman, supra,* 639 F.2d 318.) In *Taylor,* the court concluded, based on Supreme Court cases through *Siegert,* that there are two ways in which government action may result in a change of status sufficient to implicate a liberty interest. One is by action that formally or automatically excludes the plaintiff from work on a category of future public contracts or government employment opportunities. The other is by action that precludes the plaintiff from so broad a spectrum of opportunities that it interferes with the right to follow a chosen profession or trade. Contract debarment satisfies the first of these categories.

Most of the case law in the area is from federal courts; there is little California authority on a contractor's rights in the context of debarment. An exception is *Stacey & Witbeck, Inc. v. City and County of San Francisco, supra,* 36 Cal.App.4th 1074. That case concerned a debarment from public works contracting by a city agency. The court noted that the contractor had no property interest in bidding on future public works, but that it did have a protected liberty interest with respect to the two-to-five-year debarment that

was imposed, excluding it from all public works for that period. (*Id.* at p. 1086, fn. 6.)

█ Despite the paucity of California case law on the debarment issue, there is substantial authority from a roughly analogous line of cases. These decisions, beginning with *Pinsker v. Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160 [81 Cal.Rptr. 623, 460 P.2d 495], generally hold that an individual has a right to judicial intervention on a claim that he or she has been excluded from a professional association, where the exclusion deprives the person of substantial economic advantages. (See also *Hackethal v. California Medical Assn.* (1982) 138 Cal.App.3d 435 [187 Cal.Rptr. 811]; *Applebaum v. Board of Directors* (1980) 104 Cal.App.3d 648 [163 Cal.Rptr. 831]; and the leading national case in the area, *Falcone v. Middlesex County Medical Soc.* (1961) 34 N.J. 582 [170 A.2d 791].)

Since the professional associations are typically private entities, rather than units of government, the due process clause has not been held to apply. Instead, the cases have been decided on the basis of the common law. But the distinction in the fair procedure and due process rights involved appears to be one of origin rather than the protection afforded. "[T]he essence of both rights is fairness." (*Applebaum v. Board of Directors, supra,* 104 Cal.App.3d at p. 657.)

## III

█ "Once it is determined that due process applies, the question remains what process is due." (*Morrissey v. Brewer* (1972) 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484].) "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." (*Cafeteria Workers v. McElroy* (1961) 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230].) Unlike some rules, due process " 'is not a technical conception with a fixed content unrelated to time, place and circumstances.' [Citation.]" (*Mathews v. Eldridge* (1976) 424 U.S. 319, 334 [96 S.Ct. 893, 902, 47 L.Ed.2d 18].) In *Mathews,* the Supreme Court articulated three factors that guide decisions about "what process is due." (*Id.* at p. 333 [96 S.Ct. at p. 902].) They are: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of alternative or substitute procedural safeguards; and (3) the government interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. (*Ibid.*)

 The private interest in this case is considerable. While we are not informed precisely what effect the cutoff of child care contracts will have (or has had) on appellant, it is evident from the financial materials in the record that the $3 million annual loss will have a very considerable, if not devastating, impact. The work of appellant, a nonprofit corporation, is to provide child care services to children in its area. These services are within one of the statutory objectives of the Child Care and Development Services Act.

The Department, through its regulations, already has recognized the importance of the interest of contractors such as appellant. It has established a review and hearing procedure which, we assume, is for the purpose of assuring fairness and ferreting out administrative mistakes. In this case, the claim is that appellant's audit reports have been deficient (unacceptable) for a period of years. If that is true, the Department certainly is justified in declining to offer further contracts to appellant for the three-year period contemplated by its regulations. The only issues before us concern whether a hearing must be provided and, if so, what it must entail. The Department already has decided that an administrative review should be afforded, at which explanation, information and argument may be presented. This is, of course, a form of hearing. As we shall discuss, little change is needed to assure that the hearing so provided comports with appellant's liberty interest.

Finally, the government interest in obtaining proper audit reports is considerable and the significance of those reports obvious. The issue we must decide is whether, under the *Mathews* balancing test, providing a fair hearing is too much of a burden.

## IV

 "A fair trial in a fair tribunal is a basic requirement of due process." (*In re Murchison* (1955) 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed. 942].) This is true of administrative adjudication as it is of courts. "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.' [Citation.] In pursuit of this end, various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." (*Withrow v. Larkin* (1975) 421 U.S. 35, 47 [95 S.Ct. 1456, 1464, 43 L.Ed.2d 712].) The claim that the combination of investigatory and adjudicatory functions creates an unconstitutional risk of bias has been difficult to sustain, but in federal practice it has been addressed by the rule that no employee involved in investigating or prosecuting a case may participate as an adjudicator. *(Id.* at p. 51 [95 S.Ct. at pp. 1466-1467]; 5 U.S.C. § 554(d).) "The

concept of fundamental fairness includes the right to an impartial decision maker." (*Girard v. Klopfenstein, supra,* 930 F.2d at p. 743; see *Goldberg v. Kelly, supra,* 397 U.S. 254, 271.) The point is well summarized in two of the *Pinsker* cases: fair procedure (in that context) includes "a right to a tribunal which meets the prevailing standards of impartiality. Biased decisionmakers are impermissible and the probability of unfairness is to be avoided." (*Hackethal v. California Medical Assn., supra,* 138 Cal.App.3d 435, 442; *Applebaum v. Board of Directors, supra,* 104 Cal.App.3d at p. 657; see also *Cason v. Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 144 [231 P.2d 6, 21 A.L.R.2d 1387].)

 As we have discussed, the only panel member to whom appellant objected prior to or at the hearing was Glenn Ostapeck. It was right to do so. Mr. Ostapeck headed the agency within the Department that determined appellant's original and revised audit reports were "unacceptable," a finding that led to the NOPA and the subsequent refusal to offer appellant a further contract. Indeed, this was Mr. Ostapeck's decision. It also was essentially the decision appellant was appealing. Mr. Ostapeck was in the position of judging the correctness of his own decision.

After the hearing, in the trial court and on appeal, appellant also complained that two other members of the panel were biased. One of them is Carolyn Pirillo, the deputy general counsel. Ms. Pirillo represented the Department in litigation against appellant, but it appears that her activities in that respect all occurred after the 1999 hearing. She may be disqualified from serving on a new appeals panel with respect to appellant, but appellant has not shown bias while she was serving on the panel whose decision appellant challenged in the mandate proceeding.

The other panelist to whom appellant objected is Paul Miller, the public member. Appellant claims that he is on friendly terms with staff members of the Department, that he is a campaign contributor to the Superintendent of Public Instruction, who heads the Department, and that he is a business competitor with something to gain by appellant's loss. Appellant has failed to support its first two claims with evidence, and it is doubtful that, absent extraordinary circumstances, either would require recusal. The third claim, of indirect pecuniary interest, also is not borne out. All the record shows is that Mr. Miller also is a child care contractor. We do not know whether he is a competitor, or, in particular, whether his program operates in the same "service delivery area" as appellant. (See Reg., §§ 18000, subd. (g), 18002.) Nor is there any showing that elimination of Department funding of appellant's program is likely to result in more funding for Mr. Miller's program.

Finally, we deal with appellant's claim that the hearing was unfair because it was not permitted to cross-examine adverse witnesses. Appellant has not shown that it sought to cross-examine anyone. Even on appeal, the only persons it identifies for cross-examination are members of the appeals panel. We have no reason to believe that appellant will not be afforded the opportunity to cross-examine Department staff persons who participated in the staff determination that its audit reports were unacceptable.

There are, of course, other aspects of a fair hearing discussed in other cases besides those we have considered. We have not attempted to produce a handbook for contract debarment hearings. Instead, we believe it appropriate to confine our discussion to the issues presented in this case, and we have tried to do that.

V

In summary, we conclude that appellant, as a child care contractor of long standing with the Department, has a liberty interest entitling it to a fair hearing on the decision to debar it from contract eligibility. Its entitlement is not based on the failure to renew its contract for a year, but on the effect of the refusal in debarring appellant from eligibility to be a contractor for the ensuing three years. The fair hearing to which appellant is entitled, whether before a single person or a panel, should be before an arbiter that has not participated in staff decisions concluding, or leading to a conclusion, that appellant's audit reports are deficient.

DISPOSITION

The judgment is reversed, and the case remanded to the trial court with directions to set aside its order denying appellant's petition for writ of mandate and to enter a new and different order and judgment directing the Department to afford appellant a new appeals hearing before an impartial arbiter. Appellant is to have its costs on appeal.

Vogel (C. S.), P. J., and Curry, J., concurred.

A petition for a rehearing was denied September 27, 2000, and the opinion was modified to read as printed above.