TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

ROB BONTA
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | No. 18-201 |
| of | : | September 17, 2021 |
| ROB BONTA<br>Attorney General | : | |
| CATHERINE BIDART<br>Deputy Attorney General | : | |

_____

THE HONORABLE MARGO A. RAISON, COUNSEL FOR THE COUNTY OF KERN, has requested an opinion on the following questions related to the application of public meeting and procedural due process requirements to a joint powers authority.

**QUESTIONS PRESENTED AND CONCLUSIONS**

1.  Would it violate the Ralph M. Brown Act for appointees to a joint powers authority to discuss a matter that is pending before that authority with their respective member agencies, at those agencies' separately held open meetings?

No.  The contemplated discussions would not violate the Act because they would occur at open, public meetings, and there would be no collective deliberation by a majority of the members of any legislative body outside of such a meeting.

1

18-201

2. Would it violate procedural due process for a member agency of a joint powers authority to discuss with its appointee to that authority, at the member agency's open meeting, how to decide or vote a particular way on an adjudicative matter that is pending before the authority?

Depending on the particular circumstances, such discussion could violate procedural due process by infringing on a party's right to a neutral, impartial decision-maker.

## BACKGROUND

A joint powers authority is an entity created when public agencies agree to exercise a power shared by the agencies.[1] The agencies creating a joint powers authority may come from different levels of government and be subject to different statutory requirements. In this Opinion, we address questions related to a joint powers authority called the Indian Wells Valley Groundwater Sustainability Agency (Indian Wells).

The agreement creating this joint powers authority states that its purpose is to manage local groundwater pursuant to the Sustainable Groundwater Management Act, by adopting and implementing a Groundwater Sustainability Plan and providing technical and financial assistance to local groundwater agencies.[2] Among other powers and responsibilities, the Indian Wells joint powers authority may impose a penalty for groundwater extraction in violation of the Plan.[3]

Five local agencies created the Indian Wells joint powers authority and comprise its voting members.[4] Each member agency has appointed a representative to serve on the joint

---

[1] See Gov. Code, §§ 6500 et seq. (Joint Exercise of Powers Act).

[2] Indian Wells Valley Groundwater Authority Joint Exercise of Powers Agreement (Agreement), pp. 1-2, available at <https://static1.squarespace.com/static/5a70e98dd55b41f44cbb2be0/t/5ae205a4575d1f737b70678e/1524762023428/Full+JPA+Agreement.pdf> [as of September 17, 2021]; see also Wat. Code, §§ 10720–10737.8 (Sustainable Groundwater Management Act), 10723.6, subd. (a)(1) (authorizing formation of groundwater sustainability agency by joint powers agreement).

[3] See Wat. Code, § 10732, subd. (b)(2) (authorizing groundwater sustainability agency to impose certain civil penalties after providing notice and opportunity for hearing).

[4] These member agencies are the Counties of Kern, Inyo, and San Bernardino, the City of Ridgecrest, and the Indian Wells Valley Water District. (Agreement, *supra*, pp. 6–7, 9 & Exh. A.) There are also two non-voting member agencies: the United States Bureau of Land Management and the United States Naval Air Weapons Station China Lake.

18-201

powers authority's board of directors.[5]  We are informed that in advance of the joint powers authority's board meetings (but after the agenda for those meetings is posted), two member agencies have held their own respective open meetings at which they took public comment on matters that were pending before the authority, and then advised or directed their respective appointees to the authority with respect to those pending matters.[6]  We assume for the purpose of our analysis that the appointee was the only one from the Indian Wells joint powers authority board of directors who was present at the member agency's open meeting.

## ANALYSIS

### Question 1

We first consider whether the Brown Act prohibits members of the Indian Wells joint powers authority board of directors from discussing matters that are pending before the board when they attend open public meetings of the member agency that appointed them to the board.[7]

### 1.  The Brown Act's open meeting requirements

The objective of the Brown Act is to facilitate public participation in local government decisions and to curb misuse of the democratic process by secret legislation.[8]  Public agencies "exist to aid in the conduct of the people's business," and the intent underlying the Act is that public agencies' "actions be taken openly and that their

---

(Agreement, *supra*, p. 7 & Exh. B.)

[5] Agreement, *supra*, pp. 6–7, 9 & Exh. A.  Some, but not all, member agencies are required to select their appointees to the Indian Wells board of directors from the agency's own legislative body.  (Agreement, *supra*, p. 7; see also Gov. Code, § 6508 [authorizing such provision in joint powers authority agreement].)  In practice, each agency has selected its appointee from its own legislative body whether or not it is required to do so.

[6] These two member agencies—the City of Ridgecrest and the Indian Wells Valley Water District—have special voting status at the joint powers authority, and at least one of them must vote in favor of a proposed action for the Board to approve the action. (Agreement, *supra*, p. 9.)

[7] The Brown Act is set forth in Government Code sections 54950–54963.  (See Gov. Code, § 54950.5 [naming those sections the Brown Act].)

[8] *Galbiso v. Orosi Public Utility Dist.* (2008) 167 Cal.App.4th 1063, 1075–1076.

3

deliberations be conducted openly."[9]  Because the Act is a remedial statute that seeks to protect the public, courts interpret it broadly to effectuate its purpose.[10]

The Brown Act applies to "[a]ll meetings of the legislative body of a local agency."[11]  And it is expressly incorporated in the agreement creating the Indian Wells joint powers authority.[12]  Except as the Act otherwise provides, all meetings of local legislative bodies are required to be "open and public, and all persons shall be permitted to attend."[13]  A "meeting" is "any congregation of a majority of the members of a legislative body at the same time and location . . . to hear, discuss, deliberate, or take action on any item that is within the subject matter jurisdiction of the legislative body."[14]

To further the Act's purpose of facilitating public participation in local government decision-making, the legislative bodies of local agencies must give public notice of their meetings by providing the time, place, and agenda.[15]  Additionally, the public must have an opportunity at meetings "to directly address the legislative body on any item of interest to the public, before or during the legislative body's consideration of the item."[16]  The Act prohibits local legislative bodies from taking action by secret ballot.[17]  It also prohibits

---

[9] Gov. Code, § 54950; see also *ibid.* ("The people of this State do not yield their sovereignty to the agencies which serve them.  The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know.  The people insist on remaining informed so that they may retain control over the instruments they have created.").

[10] See *Golightly v. Molina* (2014) 229 Cal.App.4th 1501, 1512.

[11] Gov. Code, § 54953; see, e.g., *McKee v. Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force* (2005) 134 Cal.App.4th 354, 362; see Gov. Code, § 54952 (defining "legislative body" to include "governing body of a local agency or any other local body created by state or federal statute").

[12] Agreement, *supra*, pp. 8–9.

[13] Gov. Code, § 54953, subd. (a); see also *Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors* (1968) 263 Cal.App.2d 41, 47–48; 63 Ops.Cal.Atty.Gen. 820 (1980).

[14] Gov. Code, § 54952.2.

[15] Gov. Code, §§ 54954, 54954.2.

[16] Gov. Code, § 54954.3, subd. (a).

[17] Gov. Code, § 54953, subd. (c)(1).

them from holding closed sessions, with certain statutory exceptions.[18]  Further, the Act's open meetings requirement may not be evaded through "serial" meetings.[19]  Specifically, outside of a meeting held in compliance with the Act, the Act prohibits a majority of members of a legislative body from using "a series of communications of any kind, directly or through intermediaries, to discuss, deliberate, or take action on any item of business that is within the subject matter jurisdiction of the legislative body."[20]

### 2. In the scenario presented by the requestor, there is no collective deliberation by members of any legislative body outside of a public meeting

The scenario we confront here is one in which the legislative body of a joint powers authority is composed of one appointee from each of the member agencies.  The requestor has asked us whether it violates the Brown Act for these appointees to discuss matters that are pending before the joint powers authority, while attending an open meeting of the legislative body of their own member agency.  We assume for the sake of our analysis that no other member of the legislative body of the joint powers authority is present at the member agency meeting.[21]

We recognize that the Brown Act "does not purport to regulate the *individual* conduct of individual" members of any legislative body.[22]  Instead, the Act is concerned with collective deliberation among a majority of the members of a legislative body.[23]  As

---

[18] Gov. Code, § 54962; see, e.g., Gov. Code, §§ 54956.9 (allowing closed session relating to litigation, as specified), 54957, subd. (b) (allowing closed session relating to personnel matters, as specified); see also Gov. Code, § 54957.7 (requiring body to disclose items that will be discussed in closed session, limiting discussion to those items during closed session, and requiring body to reconvene in open session and report certain actions and votes taken in closed session).

[19] Gov. Code, § 54952.2, subd. (b).

[20] Gov. Code, § 54952.2, subd. (b)(1); see *Page v. MiraCosta Community College Dist.* (2009) 180 Cal.App.4th 471, 503–504.

[21] If we were instead presented with a scenario where more than one director of the joint powers authority board attended the meeting of a particular member agency, we would look to Government Code section 54952.2, subdivision (c)(4), which explicitly allows a majority of one legislative body to attend and participate at another legislative body's meeting. See footnotes 32–33 and accompanying text.

[22] 65 Ops.Cal.Atty.Gen. 63, 66 (1982).

[23] Gov. Code, § 54952.2, subds. (a) (providing that Brown Act applies to congregation of majority of legislative body's members to hear, discuss, deliberate, or take action on

5

the California Supreme Court has observed, some sort of collective decision-making of the body must be at stake:

> [T]he action of one public official is not a "meeting" . . . because the [Brown Act] uniformly speaks in terms of collective action, and because the term "meeting," as a matter of ordinary usage, conveys the presence of more than one person, it follows that under [the Act], the term "meeting" means that "two or more persons are required in order to conduct a 'meeting' within the meaning of the Act."[24]

The scenario presented here does not involve any collective deliberation by a majority of any legislative body outside of its open meeting. The deliberation by each of the member agencies occurs at the open meeting of that agency's legislative body. And that deliberation is not among a majority of the board of directors of the Indian Wells joint powers authority because there is only one board member on each member agency's legislative body—the appointee.[25] Indeed, even if every appointee deliberated with their appointing agency at its open meeting, that would not add up to a prohibited collective deliberation by the Indian Wells joint powers authority under the Brown Act because the appointees would not be deliberating with each other.

### 3. Consideration of opposing views does not alter our conclusion

We have considered and evaluated opposing views submitted to our Office. Ultimately, however, those views do not change our conclusion.

First, we address a concern that it would undermine the public's opportunity to participate in decision-making on matters pending before a joint powers authority if those matters were previously discussed by the legislative bodies of the member agencies.

item within body's jurisdiction), (c)(1) (exempting from Act "[i]ndividual contacts or conversations between a member of a legislative body and any other person," so long as the contacts are not used to conduct a "serial" meeting by a majority of members of that body); see *Golightly v. Molina*, *supra*, 229 Cal.App.4th at p. 1514 ("[I]t is collective decisionmaking by a legislative body, not the solitary decisionmaking of an individual public official, which is subject to the Brown Act").

[24] *Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 375–376, quoting *Wilson v. San Francisco Municipal Ry.* (1973) 29 Cal.App.3d 870, 879.

[25] See Gov. Code, § 54952.2, subds. (a)–(b); *Golightly v. Molina*, *supra*, 229 Cal.App.4th at pp. 1513–1514; *Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors*, *supra*, 263 Cal.App.2d at pp. 47–48.

6

Proponents of this view reason that, if a number of appointees to the joint powers authority sufficient for a majority vote were to definitively reach the same decision based on discussions with their member agencies, it would render the public input at the joint powers authority's own meeting irrelevant and unlawfully pre-determine a matter pending before the joint powers authority. They assert that an earlier Attorney General opinion supports this reasoning.

We disagree. The situation addressed by that earlier opinion is unlike the situation we consider here. It involved collective deliberation by a majority of the members of the same legislative body at that body's advisory subcommittee meeting.[26] The members of that subcommittee comprised three of the legislative body's seven members. We concluded that no additional members of the parent legislative body could attend the subcommittee meetings because otherwise those meetings would be attended by a majority of the members of the parent body.[27] As we described, a Brown Act problem arose because the unanticipated presence of a majority of the members of the parent body at the subcommittee meeting created the possibility that the parent body would effectively resolve matters at the subcommittee meeting, reducing the parent body's next meeting to a "rubber stamp."[28] We explained:

> Although the subcommittee meeting would be noticed and open to the public, the public would not anticipate that items will be resolved at that meeting due to the less than a quorum composition of the subcommittee. Members of the public wishing to present their views when the item is to be decided will attend the legislative body's meeting only to find that the decision has in effect already been made. The public will effectively be denied the right to present views prior to the legislative body's actual determination. Such result would undermine the Legislature's purposes in requiring notice, a posted agenda, and public participation prior to the resolution of a matter by a legislative body.[29]

---

[26] 79 Ops.Cal.Atty.Gen. 69, 69 (1996).

[27] *Id*. ("A fourth member of a seven member legislative body of a local agency may not attend, as a member of the public, an open and noticed meeting of a less than a quorum advisory committee of that body, without violating the notice, agenda, and public participation requirements of the Ralph M. Brown Act applicable to meetings of the parent legislative body.").

[28] 79 Ops.Cal.Atty.Gen., *supra*, at pp. 75–76.

[29] *Ibid*.

7

Following our Opinion, the Legislature amended the Brown Act to allow a majority of the members of a legislative body to attend committee meetings, "provided that the members of the legislative body who are not members of the standing committee attend only as observers."[30]  Further, the situation described in Question 1 is quite different from that addressed in our prior opinion.  The member agencies who appoint the board of directors of the joint powers authority are independent legislative bodies—not advisory subcommittees of the joint powers authority.  And they are not comprised solely of members of the board of directors of the joint powers authority.  Instead, there is only one member in common between each of the member agencies' legislative bodies and the board of directors of the joint powers authority.  So the problematic situation in our earlier opinion is not present.

Second, we consider a suggestion that a Brown Act violation may be found on these facts because reports and media broadcasts of the meetings of member agencies would allow the appointed members of the board of directors of the joint powers authority to gain knowledge of each other's deliberations that occurred at the meetings of their respective member agencies.  We do not see how this could be grounds for a Brown Act violation.  An enumerated exception to the Act allows members of one legislative body to attend meetings of another legislative body—and, consequently, to gain first-hand knowledge of those meetings.[31]  Specifically, the exception states that the Act does not apply to

> *[t]he attendance of a majority of the members of a legislative body at an . . . open and noticed meeting of a legislative body of another local agency*, provided that a majority of the members do not discuss among themselves, other than as part of the scheduled meeting, business of a specific nature that is within the subject matter jurisdiction of the legislative body of the local agency.[32]

If members of the board of directors of a joint powers authority may *attend* a member agency meeting without violating the Brown Act, it follows that they may also read or listen to second-hand media reports of such a meeting without running afoul of the Act.

---

[30] Gov. Code, § 54952.2, subd. (c)(6) (added by 1997 Cal. Stat., ch. 253, § 1).

[31] See Gov. Code, § 54952.2, subd. (c)(4). The members are limited to observing the meeting only when the majority is attending a meeting of its own standing committee.  (See Gov. Code, § 54952.2, subd. (c)(6).)

[32] Gov. Code, § 54952.2, subd. (c)(4), italics added.

8

Finally, we consider a suggestion that another Attorney General opinion, dealing with a joint powers authority, supports the conclusion that the circumstances here violate the Brown Act. That opinion concluded that a vote by an appointee to a joint powers authority was valid even though the appointee's vote was contrary to the appointing agency's position on the matter.[33] We recognized that a member of a joint powers authority's legislative body has independent discretion when voting on authority matters.[34] If anything, that earlier opinion supports—rather than undercuts—the conclusion we reach here. Because an appointee to the legislative body of a joint powers authority is not bound by the appointing agency's position, an opportunity would remain for public participation in the appointee's decision-making at the meeting of the joint powers authority.

**Question 2**

The second question asks whether a procedural due process violation would occur if a member agency at its open meeting discussed with its appointee to a joint powers authority how to decide or vote a particular way on an adjudicative matter that comes before the authority. A matter is "adjudicative" if it involves "the actual application of already existing rules to a specific set of existing facts," in the manner of a tribunal, as opposed to the development of legislative rules to apply to future cases.[35] In the scenario presented by Question 2, then, the appointed directors of the joint powers authority would "act in a quasi-adjudicatory capacity similar to judges."[36]

When "an administrative agency conducts adjudicative proceedings, the constitutional guarantee of due process of law requires a fair tribunal."[37] This requirement

---

[33] See 83 Ops.Cal.Atty.Gen. 267, 267–268 (2000).

[34] *Id*. at p. 268, citing *Harbach v. El Pueblo De Los Angeles etc. Com.* (1971) 14 Cal.App.3d 828, 834, and finding nothing to the contrary in the relevant statute, ordinances, resolutions, or joint powers agreement.

[35] *Meridian Ocean Systems, Inc. v. State Lands Com.* (1990) 222 Cal.App.3d 153, 167.

[36] *Petrovich Development Co., LLC v. City of Sacramento* (2020) 48 Cal.App.5th 963, 973.

[37] *Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 737. Our due process analysis is limited to constitutional principles that would govern any joint powers authority. A particular joint powers authority may also be governed by a statute that provides additional procedural rules. (See, e.g., Gov. Code, § 11400, subd. (a) [identifying "administrative adjudication provisions of the Administrative Procedure Act"]; see also Gov. Code, §§ 11410.10–11410.30 [applicability of administrative adjudication provisions].)

derives from both the federal and state Constitutions, which prohibit a governmental agency from depriving any person of property without due process of law.[38] "The touchstone of due process is fundamental fairness."[39] Due process therefore requires (among other things) an impartial adjudicator who is "free of bias for or against a party."[40]

To be sure, due process requirements in administrative adjudications "allow[] more flexibility" than in the context of judicial proceedings.[41] In applying due process principles to administrative proceedings, our state court of appeal has emphasized that "the question is simply what process is due in a given circumstance."[42] "The standard of impartiality required at an administrative hearing is less exacting than that required in a judicial proceeding."[43] But due process "*always* requires a relatively level playing field, the 'constitutional floor' of a 'fair trial in a fair tribunal.'"[44] "[I]n other words," it requires "a

---

[38] U.S. Const., 14th Amend., § 1; Cal. Const., art. 1, § 7, subd. (a).

[39] *People v. Lemcke* (2021) 11 Cal.5th 644, 655; see *id.* at p. 659, fn. 7 ("While the protections afforded under the due process clauses of the California Constitution and the federal Constitution are not coterminous [citations], we have previously acknowledged that, as with the federal Constitution, the 'essence' of our state due process clause is 'fundamental[] fair[ness in the] decision-making process.' [Citations.]").

[40] *Morongo Band of Mission Indians v. State Water Resources Control Bd.*, *supra*, 45 Cal.4th at p. 737; see *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 214 (discussing due process in administrative adjudications); *Horn v. County of Ventura* (1979) 24 Cal.3d 605, 612 (procedural due process applies to administrative but not legislative matters); *Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482 (same); 78 Ops.Cal.Atty.Gen. 77, 78 (1995).

[41] *Today's Fresh Start, Inc. v. Los Angeles County Office of Education*, *supra*, 57 Cal.4th at p. 214 (noting that while the "bar against financially interested adjudicators applies with as much force to administrative adjudicators as to judicial officers" in other respects, "administrative hearings need not be conducted with the same rigor demanded of judicial proceedings," citing *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1027 and *Gai v. City of Selma* (1998) 68 Cal.App.4th 213, 219).

[42] *Nightlife Partners v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 90.

[43] *Gai v. City of Selma*, *supra*, 68 Cal.App.4th at p. 219; see, e.g., *Withrow v. Larkin* (1975) 421 U.S. 35, 56 (recognizing that it does not violate due process for an agency decision maker "to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings").

[44] *Nightlife Partners*, *supra*, 108 Cal.App.4th 81, 90, original emphasis.

fair hearing before a neutral or unbiased decision-maker."[45]

When analyzing claims of a prohibited bias, the balancing inquiry called for in most procedural due process cases does not apply.[46] "[T]he unfairness that results from biased decisionmakers strikes so deeply at our sense of justice that it differs qualitatively from the injury that results from insufficient procedures."[47] The fact that a decision-maker with a prohibited bias participated in an adjudicatory decision is enough to invalidate the decision.[48] And if a legislative body performs the adjudication, the participation of one member with demonstrable bias generally taints the adjudication, because it is impossible to know what effect it had on other members of the body.[49]

A due process violation can be established "by proof of actual bias" or by "showing a situation 'in which experience teaches that the probability of actual bias on the part of the

---

[45] *Ibid*.

[46] *Haas v. County of San Bernardino*, *supra*, 27 Cal.4th at p. 1035. Generally, courts analyze federal due process claims by balancing three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews v. Eldridge* (1976) 424 U.S. 329, 335.) Due process analysis under the California Constitution also weighs a fourth factor: "the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official." (*People v. Allen* (2008) 44 Cal. 4th 843, 862–863, 868.)

[47] *Haas v. County of San Bernardino*, *supra*, 27 Cal.4th at p. 1036. "In Justice Holmes' famous phrase, 'even a dog distinguishes between being stumbled over and being kicked.'" (*Ibid.*)

[48] *Woody's Group, Inc. v. City of Newport Beach* (2015) 233 Cal.App.4th 1012, 1022–1023; *Nasha v. City of Los Angeles*, *supra*, 125 Cal.App.4th at p. 485 ("Because the Planning Commission's decision was tainted by bias and must be vacated, it is unnecessary to address Nasha's other contentions").

[49] *Cinderella Career & Finishing Schools, Inc. v. FTC* (D.C. Cir. 1970) 425 F.2d 583, 592 ("Litigants are entitled to an impartial tribunal whether it consists of one [person] or twenty and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured"); see, e.g., *Nasha v. City of Los Angeles*, *supra*, 125 Cal.App.4th at pp. 478, 485 (bias of one of three planning commissioners tainted commission's decision).

judge or decisionmaker is too high to be constitutionally tolerable.'"[50]  Whether such a situation exists is determined "based on an objective assessment of the circumstances in the particular case."[51]  The focus of that assessment is whether, "under a realistic appraisal of psychological tendencies and human weakness," the situation "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."[52]

Bias may result from an adjudicator's financial interests or other circumstances.[53] When a decision maker has a "financial interest [that] would offer a possible temptation to the average person as judge not to hold the balance nice, clear and true," that violates due process.[54]  But "[a]bsent a financial interest, adjudicators are presumed impartial."[55]  This "presumption of impartiality can be overcome only by specific evidence demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias."[56]  A mere subjective appearance of bias is not grounds for disqualification.[57] Ultimately, bias "must be established with concrete facts rather than inferred from mere appearances."[58]

---

[50] *Morongo Band of Mission Indians v. State Water Resources Control Bd.*, *supra*, 45 Cal.4th at p. 737, quoting *Withrow*, *supra*, 421 U.S. at p. 47; see *Golden Day Schools, Inc. v. State Dept. of Educ.* (2000) 83 Cal.App.4th 695, 709.

[51] See *People v. Peoples* (2016) 62 Cal.4th 718, 788.

[52] *Withrow*, *supra*, 421 U.S. at p. 47.

[53] See *Caperton v. A.T. Massey Coal Co.* (2009) 556 U.S. 868, 876–877.

[54] *Haas v. County of San Bernardino*, *supra*, 27 Cal.4th at p. 1026.

[55] *Today's Fresh Start, Inc. v. Los Angeles Cty. Off. of Educ.*, *supra*, 57 Cal. 4th at p. 219.

[56] *Morongo Band of Mission Indians v. State Water Resources Control Bd., supra,* 45 Cal.4th at p. 741; see also *Lent v. California Coastal Commission* (2021) 62 Cal.App.5th 812, 855 ("A party must allege concrete facts that demonstrate the challenged judicial officer is contaminated with bias or prejudice. 'Bias and prejudice are never implied and must be established by clear averments,'" quoting *Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 792).

[57] *Andrews v. Agricultural Labor Relations Bd.*, *supra*, 28 Cal.3d at pp. 791–794.

[58] *Petrovich Development Co.*, *supra*, 48 Cal.App.5th at p. 974, quoting *Independent Roofing Contractors v. California Apprenticeship Council* (2003) 114 Cal.App.4th 1330, 1340.

12

We are asked whether, in light of the above principles, it would violate procedural due process for a member agency to discuss with its appointee to the board of directors of a joint powers authority how to decide or vote a particular way on an adjudicative matter that is pending before the authority. We have not found any judicial precedent addressing this precise scenario. And we recognize that a member agency's instruction to vote a certain way would not legally bind an appointee during the adjudication before the joint powers authority.[59] Nevertheless, existing precedent suggests that the member agency's discussion of the pending matter could compromise the appointee's neutrality in at least two ways.

First, a member agency's consideration of a matter could, in some circumstances, create a situation where the appointee relies on evidence outside the record that is before the joint powers authority, or prejudges the matter prior to the adjudicatory proceeding by the joint powers authority. The requestor's legal analysis focuses on this possibility, reasoning that the member agency's deliberations about the matter would effectively be a separate hearing at which the appointee would hear evidence and testimony that the appointee would later rely on during the adjudicatory proceeding before the joint powers authority. We agree that it could violate due process if the appointee voted based on evidence presented to the member agency—but not to the joint powers authority—or on other "information of which the parties were not apprised and which they had no opportunity to controvert."[60] The right to a fair hearing "would be meaningless if the tribunal were permitted to base its determination upon information received without the knowledge of the parties."[61] We also take seriously the concern that the appointee might prejudge the matter as a result of the proceedings before the member agency. We recognize that courts have upheld a variety of administrative procedures where agency decision makers investigate, hold hearings, and even form tentative views before adjudicating a matter.[62] "[A]dvance knowledge of adjudicative facts that are in dispute . . . does not

---

[59] See 83 Ops.Cal.Atty.Gen., *supra*, at p. 267.

[60] *English v. City of Long Beach* (1950) 35 Cal. 2d 155, 158.

[61] *Id*. at p. 159; see also *ibid.* ("A hearing requires that the party be apprised of the evidence against [it] so that [it] may have an opportunity to refute, test, and explain it, and the requirement of a hearing necessarily contemplates a decision in light of the evidence there introduced"), *Vollstedt v. City of Stockton* (1990) 220 Cal. App. 3d 265, 269 (holding that a city manager violated due process by upholding a demotion based on information received from the city's personnel director instead of from the hearing before the city's civil service commission).

[62] *Today's Fresh Start, Inc. v. Los Angeles Cty. Off. of Educ.*, *supra*, 57 Cal. 4th at pp. 226–227 (rejecting the view "that engaging in an administrative investigation and forming opinions based on the fruits of that investigation yields the sort of extrinsic bias the due

13

disqualify the members of an adjudicatory body from adjudicating a dispute."[63]  But if it were demonstrated that the appointee was unwilling to reconsider the recommendation of the member agency, that could violate due process.[64]

Second, we believe that a member agency's discussion with its appointee about how to vote in a particular way in an adjudicative matter, coupled with the agency's position of influence over the appointee, could create independent due process concerns.  As a general matter, procedural due process concerns can arise when someone with an interest in a proceeding has disproportionate influence over the decision maker.  In *Caperton v. A.T. Massey Coal Company* (2009) 556 U.S. 868, for instance, the United States Supreme Court held that it violated due process for a judge to hear an appeal brought by a company whose chairman made massive contributions to the judge's election campaign shortly before the company filed the appeal.  The Court reasoned that "there is a serious risk of actual bias— based on objective and reasonable perceptions—when a person with a personal stake in a particular case *had a significant and disproportionate influence in placing the judge on the case* by raising funds or directing the judge's election campaign when the case was pending or imminent."[65]  In a similar vein, courts in other states have repeatedly disapproved of the appearance at the hearing on behalf of a party by one who appoints the adjudicator.[66]

---

process clause was intended to prohibit").

[63] *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 841, quoting *Breakzone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1236.

[64] *Id*. ("There must be . . . a commitment to a result (albeit, perhaps, even a tentative commitment), before the process will be found violative of due process"); see, e.g., *Furtney v. Simsbury Zoning Comm'n* (1970) 159 Conn. 585, 594 ("The decisive question in the instant case is whether Eno [a commissioner] had actually made up his mind, in advance of the public hearing, that he was going to approve the proposed change of zone regardless of any changes or arguments in opposition which might be urged at the hearing"); cf. *Today's Fresh Start*, *supra*, 57 Cal. 4th at p. 227, discussing the United States Supreme Court's decision in *Trade Comm'n. v. Cement Institute* (1948) 333 U.S. 683 ("Even assuming that the entire commission had formed the view, based on its investigation, that the cement industry was engaged in unlawful price fixing, that view did not prevent members of the cement industry from producing voluminous evidence, presenting testimony and argument, and persuading the commission to revise its conclusions").

[65] *Caperton*, *supra*, 556 U.S. at 884, italics added.

[66] See, e.g., *Place v. Board of Adjustment of Borough of Saddle River* (1964) 42 N.J. 324, 332 (declaring this practice "patently improper"); *Barkey v. Nick* (Mich. Ct. App. 1968) 11 Mich.App. 381, 384–385 (voiding a decision "made pursuant to an argument by one charged in part with the appointment of that administrative body," and finding it

Courts have also recognized that, in certain circumstances, an appointee's desire to appease other government officials creates an unacceptable risk of bias. In *Jarrott v. Scrivener* (D.D.C. 1964) 225 F.Supp. 827, for example, the court found a due process violation based on secret communications from highly placed government officials to members of a zoning board. The two board members, both "relatively subordinate government employees," were informed "that a favorable decision" on a zoning matter "would be pleasing, and an unfavorable decision displeasing, to persons in very high governmental brackets."[67] The court found that these communications created pressure that was real, "and the Board members contacted could not fail to be aware that they would incur administrative displeasure if they decided the appeal unfavorably."[68] The court added that there "might be room" for a different conclusion if the communications had been public.[69]

The question presented here potentially implicates the general concerns underlying these cases, but the factual scenario is obviously different from the ones discussed above. Unlike *Jarrott*, we assume that any discussion on how to vote would be communicated to the appointee in the context of an open meeting of the member agency. And unlike *Caperton*, there is no indication that anyone at the member agency holds a personal stake in the matter or made the appointment with a particular matter in mind. Nonetheless, we recognize that the scenario contemplated in the question presented could potentially exert a substantial external influence on the appointee's decision with respect to an adjudicative matter. For example, an appointee could face significant political repercussions for breaking with the member agency's direction, including the possibility of losing the appointment on the joint powers authority board. And the appointee might even face financial pressure if, for example, the appointee receives remuneration for the appointment.

Ultimately, more facts would be needed to assess bias in any given case. A recent state court of appeal decision further illustrates the fact-specific nature of the inquiry that would be required. In *Petrovich Development Co., LLC v. City of Sacramento* (2020) 48 Cal.App.5th 963, the court considered an adjudicatory hearing conducted by a city council about a conditional use permit for a gas station. One of the city councilmembers lived in a neighborhood near the proposed station, belonged to a neighborhood association that

---

imposed "duress on the members of the board, not as a matter of fact, but as a matter of law").

[67] *Jarrott v. Scrivener* (D.D.C. 1964) 225 F.Supp. 827, 834.

[68] *Ibid*.

[69] *Ibid*.

opposed the station, and made statements opposing it.[70] The court held that these facts, standing alone, did not demonstrate an unacceptable probability of bias, but that the councilmember "crossed the line into advocacy against the project" in specific actions leading up to the hearing.[71] The "concrete facts" showing bias included "affirmative steps to assist opponents of the gas station conditional use permit" and the councilmember's work to organize opposition at the very hearing where he was supposed to be a neutral decision maker.[72]

The question before us today is framed in general terms and, as illustrated, procedural due process analysis requires a careful inquiry into "the circumstances in the particular case."[73] As a general matter, however, we believe that the scenario presented here could create a substantial risk of infringing a party's due process right to a neutral, impartial decision-maker in the adjudicatory proceeding. The member agency's discussion of how to vote a particular way could lead the appointee to rely on extrinsic evidence or prejudge the matter. And it could also create varying degrees and types of pressure on the appointee. The result could very well be a risk of actual bias or prejudgment too high to be constitutionally tolerable.[74]

*****

---

[70] *Petrovich Development Co., LLC v. City of Sacramento*, *supra*, 48 Cal.App.5th at p. 974.

[71] *Ibid.*

[72] *Id*. at 976.

[73] *People v. Peoples*, *supra*, 62 Cal.4th at p. 788.

[74] See *Morongo Band of Mission Indians v. State Water Resources Control Bd.*, *supra*, 45 Cal.4th at p. 737.

16